BURLINGTON NORTHERN RAILROAD
CO., et al., Plaintiffs,

v.

UNITED TRANSPORTATION
UNION, Defendant,

v.

CHICAGO & NORTH WESTERN TRANS-
PORTATION CO., et al., Joined Coun-
terclaim Defendants.

UNITED TRANSPORTATION
UNION, Plaintiff,

v.

UNITED STATES of America, Defendant,

Burlington Northern Railroad
Co., et al., Intervenors.

Civ. A. Nos. 91–1851 (HHG), 91–1861.

United States District Court,
District of Columbia.

Dec. 20, 1991.

William J. Curtin, Harry A. Rissetto, Peter Buscemi, D. Michael Underhill, Judith C. Preston, Morgan, Lewis & Bockius, Washington, DC, for Burlington Northern R.R. Co., et al.

Clinton J. Miller, III, Gen. Counsel, United Transp. Union, Cleveland, OH, John A. Edmond, Mark Masling, Guerrieri, Edmond & James, Washington, DC, for United Transp. Union.

Ralph J. Moore, John Townsend Rich, D. Eugenia Langan, Shea & Gardner, Washington, DC, James P. Daley, Senior Vice President, General Counsel, and Secretary, Ronald J. Cuchna, Vice President–Law, Chicago and North Western Transp. Co., Chicago, IL, for Chicago and North Western Transp. Co.

A.L. Dent, III, Fulbright & Jaworski, Houston, TX, for Houston Belt & Terminal Ry. Co. and Port Terminal R.R. Ass'n.

Theodore C. Hirt, Eric D. Goulian, U.S. Dept. of Justice, Civil Div., Washington, DC, (Ronald M. Etters, Gen. Counsel Nat. Mediation Bd., of counsel), for defendant U.S.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

This case involves a dispute over the constitutionality and meaning of Public Law No. 102–29, 105 Stat. 169, which was signed into law by the President on April 18, 1991. Ten railroads have filed suit against the United Transportation Union (UTU) seeking a declaratory judgment that the law is constitutional. UTU, in turn, counter-claimed that the law exceeded the scope of congressional power under the Commerce Clause and constituted a taking within the meaning of the Fifth Amendment. UTU has also sued the United States challenging the constitutionality of the Act. The ten railroads sought to intervene in the action against the United States and this Court consolidated the cases.

The representational issue is presented by another counterclaim by UTU against the ten railroad plaintiffs and the Chicago and North Western Transportation Company who were joined as a counterclaim defendant on this issue.[1] In this claim UTU charges that Public Law Number 102–29, which appears to designate another union, the Brotherhood of Locomotive Engineers, as the exclusive representative of locomotive engineers as to claims and grievances, cannot deprive UTU of its representative capacity.

For the reasons set forth below, the Court finds that 102–29 is (1) well within the wide scope of the Commerce Clause and (2) does not constitute a taking within the meaning of the Fifth Amendment. As to the representational claim by UTU, the Court finds that the

issue is beyond the subject matter jurisdiction of this Court.

## I

### The Constitutionality of 102–29

#### A. Background

The development of the railroad industry significantly parallels both the development of this nation, see Leo Sheep Co. v. United States, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979), as well as this nation's labor law. The extensive briefing by the parties in this case is testimony to this point. Nonetheless, the Court will attempt to reduce the complicated web or events, laws and procedures to the minimum necessary for an analysis of its most recent addition, 102–29.

After extended proceedings under the Railway Labor Act failed to produce a new collective bargaining agreement between most of the nation's railroads and their corresponding unions, eight unions, including UTU, struck on April 17, 1991. That day Congress passed 102–29 in an effort to end the nationwide rail strike. In the early morning hours the next day the President signed the bill into law. The legislation was based on the recommendations of Presidential Emergency Board 219 (hereinafter the Board). The legislation essentially imposed a settlement on the parties and established procedures by which they could resolve remaining difference.

The constitutional challenge in this case focuses specifically on that portion of 102–29 referred to as the "crew consist procedures." Under these procedures the UTU and the relevant railroads must negotiate regarding proposed changes in the number of ground service personnel who must be employed on the trains of the various railroads, that is, the number of personnel making up each ground crew. The procedures establish that if agreement is not reached by October 31, 1991, any party may request binding arbitra-

---

1. UTU made two additional counterclaims that are no longer before the Court. One involved application of procedures under the new law, and the other count joined Houston Belt & Terminal Railway Company and Port Terminal Railroad Association as counterclaim defendants, alleging procedural violations by the parties. Both these claims, counts I and III, have been dismissed by stipulation of the parties.

For the sake of clarity the Court will refer to the railroad plaintiffs, intervenors and counterclaim defendants as simply the railroads.

tion to resolve any and all remaining crew consist issues. Subsequently, all but one of the railroads requested that UTU negotiate on this matter, specifically regarding reduction in the minimum number of ground service personnel required under their respective collective bargaining agreements with UTU. UTU, in turn, pointed to "moratorium" provisions in the collective bargaining agreements by which the railroads are prohibited from attempting to negotiate or arbitrate any changes regarding crew consist. Because 102–29 creates procedures by which UTU and the railroads must negotiate or arbitrate on the crew consist issue, UTU argues, the law is unconstitutional.

To understand the context of this issue, it must be observed that railroad/labor negotiations have occurred on both the local and national levels. Local negotiations are typically those between a single railroad and one or more unions. On the national level there has been collective bargaining between several railroads and unions. This is referred to in industry parlance as "national handling."

The Railway Labor Act (RLA)[2] regulates heavily the process of collective bargaining. The RLA creates a long, multi-stage process in which either party to a collective bargaining agreement may formally propose a change to a term or terms of an existing agreement by serving notice under the provisions of the law. The parties are then required to negotiate and, if no agreement is reached, may seek the mediation services of the National Mediation Board (NMB). If the NMB cannot foster an agreement the parties are afforded the opportunity to submit the dispute to binding arbitration. If arbitration is not pursued and the NMB finds that the lack of an agreement may threaten interstate commerce, the NMB must so notify the President. The President then may appoint a Presidential Emergency Board to investigate the matter and make its recommendations within 30 days.

One potential problem with this process is that it allows parties to seek revisions to collective bargaining agreements in near perpetuity. To avoid infinite renegotiation and make the agreement more constant, railroads and unions have sometimes included so-called moratorium agreements in their collective bargaining agreements. The moratorium is simply an agreement that neither party will invoke the procedures of the RLA described above to reopen negotiations on a certain portion of the agreement for a fixed period of time. Each of the railroads in this case have entered into at least one crew consist agreement with UTU that contains a moratorium provision.

In July 1988 UTU served notice under the RLA seeking changes in the collective bargaining agreements to which it was a party. A process of negotiations began. The railroads made proposals for wage cuts for its employees or, in the alternative, reduction in the number of ground crew personnel. Relying upon the moratoria agreements, the UTU did not consent to negotiate the crew consist issue.

In accordance with the procedures described *supra*, when the negotiations failed to produce an agreement the NMB stepped in to mediate. The railroads, UTU, and other unions agreed to a procedure by which the President would appoint an emergency board to investigate the relevant issues.

On May 3, 1990, the President created Presidential Emergency Board 219.[3] The Board conducted hearings in which all the parties participated and in which the crew consist issue was raised.[4] The Board issued several, inter-related recommendations, including that there be no wage reductions but instead a series of wage increases. In addition, the Board recommended that the crew consist issue should be opened for negotiation despite the moratorium.

Following the Board's report, the parties entered into negotiations. Some of the par-

---

2. 45 U.S.C. §§ 151 *et seq*.

3. By Executive Order No. 12714.

4. The parties dispute whether the crew consist issue was properly before the Board. As the

Court notes *infra*, this issue is not critical to the constitutionality of the subsequent legislation and does not, therefore, inhibit the Court's consideration for purposes of summary judgment.

ties reached agreements, others did not. Upon expiration of the designated period following the Board's report, eight unions, including UTU, struck on April 17, 1991. The same day Congress essentially converted the Board's recommendations into a bill which passed both houses and was signed into law by the President the next day—Public Law Number 102–29. The law also provided procedures by which the parties .could .clarify and modify the application of 102–29 through a special presidential board. The special board was authorized under 102–29 to conduct hearings and then issue a report that would become law ten days later.

The President appointed a special board to which UTU appealed on the crew consist/moratorium issue. Although the special board made some modifications to 102–29, it left intact the lifting of the crew consist moratoria. Subsequently, the railroads served notice that they wished to negotiate on the matter of crew consist. The railroads, UTU and the United States are now before this Court regarding the issue of whether the crew consist portion of 102–29 exceeds the scope of the Commerce Clause and whether it constitutes a taking under the Fifth Amendment.

### B.   102–29 as an Exercise of the Commerce Power

█ The Supreme Court has long since established the vast expanse of the Commerce Clause.[5] *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). The argument that Congress has exceeded its commerce power has become a long shot at best. *See The Lottery Case,* 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903). UTU fares no better today in its challenge to 102–29. The Supreme Court has said that the commerce power may be "exercised to its utmost extent and acknowledges no limitations, other than are prescribed in the Constitution." *Gibbons, supra,* 22 U.S. (9 Wheat.) at 196.

More specifically, Congress has frequently exercised its commerce power with regard to the rail industry. The Court has upheld the exercise of the federal commerce power to permit union shop agreements, *Railway Em-*

ployes' *Dep't v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); and to compel railroads to negotiate with labor organizations for purposes of collective bargaining, *Virginian R. Co. v. System Federation,* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). The Court has observed that the Commerce Clause grants Congress "plenary authority to regulate labor relations in the railroad industry in general." *United Transp. Union v. Long Island R.R. Co.,* 455 U.S. 678, 682–83, 102 S.Ct. 1349, 1353, 71 L.Ed.2d 547 (1982).

It is not controversial that regulation of the railroads by the Congress may include the imposition of specific terms. *See, e.g., Maine C.R. Co. v. Brotherhood of Maintenance of Way Employees,* 835 F.2d 368 (1st Cir.1987); *Louisville & N.R. Co. v. Bass,* 328 F.Supp. 732 (W.D.Ky.1971); *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & O. R. Co.,* 225 F.Supp. 11 (D.D.C.), *aff'd per curiam,* 331 F.2d 1020 (D.C.Cir. 1964). Congress has legislated on crew sizes, *United Transp. Union v. Consolidated Rail Corp.,* 535 F.Supp. 697 (Regional Rail Reorg.Ct.1982), and implemented the crew consist recommendations of another presidential emergency board. *See* Pub.L. No. 100–429, 102 Stat. 1617.

Finally it must be noted that the commerce power is not impeded by private contracts. When the subject matter of a private contract is within the province of Congressional action it is subject to the reach of that "dominant constitutional power." *Norman v. Baltimore & O.R. Co.,* 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935). The RLA has been held to within the commerce power even where it effects private contracts. In *Norfolk & W.R. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), the Supreme Court found that Congress had empowered the Interstate Commerce Commission to abrogate rail industry collective bargaining agreements in the course of implementing ICC approved consolidation. No violation of the commerce power was observed. *See also Brotherhood of R.R. Shop Crafts Lodge No. 3 v. Lowden,* 86 F.2d 458 (10th Cir.1936) (up-

---

5.   U.S. Const. art. I, sec. 8, cl. 3.

holding the RLA despite the fact the law altered an existing collective bargaining agreement).

■ The broad power that Congress has exercised in the rail industry by virtue of the Commerce Clause applies equally to 102–29 and the issue before this Court. The exercise of federal power must have a rational basis for Congress to have found a relationship between the exercise at issue and interstate commerce. *Preseault v. Interstate Commerce Commission,* 494 U.S. 1, 17, 110 S.Ct. 914, 924, 108 L.Ed.2d 1 (1990); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964). In addition, where the reviewing Court finds such a rational basis to exist it is immaterial whether Congress has made explicit findings relating its enactment to interstate commerce. *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

Congress enacted 102–29 in order to end a rail strike and to protect interstate transportation. In addition to the interstate nature of the rail system itself, the rails carry interstate commerce itself and play an integral role in the central nervous system of our nation's economy. The commerce power is clearly and rationally related to 102–29 as an effort to end the rail strike and maintain the operation of the rails thereafter.

By implementing the recommendations of the Board as law, Congress attempted to impose a compromise solution to the rail impasse: increasing wages while opening the door to negotiation on staffing. Congress further rounded the edges of the measure by including procedures for the special board to hear the parties and, where appropriate, modify the provision. As noted above, the fact that Congress imposed, to some extent, a solution and terms does not place 102–29 beyond the scope of the commerce power. Nor is that power constrained by the private nature of the moratorium agreements.

UTU argues, however, that 102–29 is a "wholly irrational" exercise of the commerce power. UTU asserts that the public purpose of the law was to stabilize and ensure peace in the rail industry but that 102–29, by negating the effect of the crew consist moratoria, will "by definition result in bitter disputes, strikes and eventual disruption of rail service." UTU's argument, however, implicitly concedes that 102–29 is rationally related to interstate commerce; the union simply argues that it is wrong.

It is not for the courts to second guess the policy choice that Congress has made, rather to ensure that the policy is within the confines of Article I. Commerce Clause jurisprudence does not require that Congress be right, only that it be rational. It is of no relevance therefore that 102–29 may not, in the end, stabilize the railroads. It is reasonable for Congress to have concluded that by imposing terms that drew from the interests of both sides and that was implemented in a procedural framework, the rail strike would end and the rails would run.

UTU also argues that the law is illegitimate because 102–29 is based on the Board's recommendations and that the crew consist issue was beyond the jurisdiction of the Board. The railroads argue that while the crew consist issue was not, per se, before the Board, it became an issue because the railroads would not accede to a wage increase if they could not decrease ground staffing. It is not necessary, however, for this Court to resolve this issue because the jurisdiction of the Board in no way constrains the power of the Congress.

While UTU makes much of Congress "rubber-stamping" the Board's recommendations, the Congress must only comply with the bicameralism and presentment requirements of the Constitution.[6] The contents of laws may be written by citizens, presidents and all others. Congress did not vest or delegate its Article I powers to the Board; rather Congress adopted the Board's recommendations in the manner prescribed by the Constitution. The only question then is whether the law exceeds the constraints on Congressional power in the Constitution, not whether it exceeds limits placed on a presidential advisory board.

6. *See* U.S. Const. Art. I, §§ 1, 7, cl. 2.

Public Law Number 102–29 does not violate the Commerce Clause.

### C. 102–29 As a Taking Under the Fifth Amendment

■ UTU next argues that because the effect of 102–29 was to undo the moratoria agreements on the crew consist issue, the government has taken its property without compensation in violation of the Fifth Amendment.[7] The Court begins by considering the factors fashioned by the Supreme Court in determining whether a government action constitutes a taking.

The Court in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) considered (1) the economic impact of the regulation on the plaintiff; (2) the extent to which the regulations interfered with distinct investment-backed expectations; and (3) the character of the governmental action. In considering these factors it should be noted that economic legislation that affects private contracts to which the United States is not a party has not been considered a taking. *See e.g., Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 222–28, 106 S.Ct. 1018, 1024–27, 89 L.Ed.2d 166 (1986); *Consolidated Rail Corp. v. Metro–North Commuter R.R.*, 638 F.Supp. 350, 355–57 (Regional Rail Reorg.Ct. 1986).

First. The complex interrelationship of costs and benefits that constitutes 102–29, mitigates its economic impact. In *United Transp. Union v. Consolidated Rail Corporation*, 535 F.Supp. 697 (Regional Rail Reorg.Ct.1982), the court rejected a takings claim by UTU regarding the terms of the Northeast Rail Service Act of 1981. In that case Judge Friendly found that there was an insubstantial economic impact because the law did not abrogate all of the union's rights under the crew consist agreements, rather it created an array of benefits such as voluntary furloughs, severance allowances and the transfer of seniority status to other locations. *Id.* at 707.

Similarly, under 102–29 the door is merely opened to decreased staffing, the law does not guarantee any decrease or specify what it might be ultimately.[8] In addition, 102–29 includes wage increases and lump-sum payments as part of a package that included removal of the crew consist moratoria. Thus, the effect of 102–29 is indeterminate in itself because it simply makes negotiation of changes possible and it is not an isolated change but part of a regulatory package.

Second. It cannot be said that UTU had a reasonable expectation that the moratoria agreements were beyond the pale of Congressional action. As a general matter, in an area as heavily regulated as the railroads and in which Congress has repeatedly demonstrated its willingness to legislate solutions to labor disputes, any expectancy would seem unreasonable if not naive.

UTU argues, however, that despite the breadth of congressional regulation, the crew consist issue has traditionally been handled at the local level, making it reasonable to expect that national legislation would not involve the crew consist matter. But this argument is specious. Simply because an issue has traditionally been treated at the local level does not at all imply that Congress will not one day take it up. The law books are filled with such examples. Thus it is difficult to imagine that those involved with this small island of local handling could not have foreseen or anticipated that the sea of federal regulations that surrounds it would never touch its shore.[9]

Third. The character of the government action in this case hardly resembles a taking within the meaning of the Fifth Amendment. The nature of the governmental action is critical. *Keystone Bituminous Coal Ass'n v.*

---

7. "... Nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

8. That may be a from a worker's point of view a very technical distinction; but such is the nature of the analysis of what constitutes a taking under the Fifth Amendment.

9. In addition, even assuming that there was a reasonable expectancy, it could not be said to be investment backed.

*DeBenedictis,* 480 U.S. 470, 488, 107 S.Ct. 1232, 1243, 94 L.Ed.2d 472 (1987). UTU attempts to portray 102–29 as the equivalent of a "total, physical, permanent occupation of private land by the government." UTU Motion for Partial Summary Judgment (September 9, 1991) at 27. In fact, the act may be more accurately described as a regulatory matter that adjusts the benefits and burdens of private parties in the interests of public policy goals.

The law cannot be characterized, as UTU portrays it, as a complete appropriation. The government has not physically invaded or permanently appropriated any of the union's or worker's assets for its own use. *See Connolly, supra,* 475 U.S. at 211, 106 S.Ct. at 1018. Congress typically creates burdens for some that benefit others whenever it regulates commercial or human affairs. *Id.* at 223, 106 S.Ct. at 1025. Price controls, minimum wage laws, any economic regulation invariably requires one party to use its assets in a manner that it was not required to previously. *Id.*

As discussed *supra,* 102–29 is related to the public policy goal of ending the rail strike and stabilizing the industry. The law opens the crew consist issue to a negotiating process. And again it must be noted that the change as to the crew consist issue is interwoven in a fabric of other changes in wages and benefits. As Judge Friendly found, where Congress readjusts rights and burdens within its broad power under the Commerce Clause, private arrangements will not stand in the way. *Conrail,* 535 F.Supp. at 708. There is no violation of the Fifth Amendment.

## II

### *The Representational Issue*

█ Count II of UTU's counterclaim involves whether 102–29 extinguishes UTU's right to represent its engineer members in grievance procedures by naming another union, the Brotherhood of Locomotive Engineers (hereinafter BLE) as the exclusive union representative for grievance purposes. The Court finds that it does not have subject matter jurisdiction to entertain this claim.

Prior to 102–29 UTU represented engineer members in claims or on the property grievance procedures viz-a-viz many of the railroads in the instant case even where the UTU engineer members belonged to a craft or class represented by the BLE. This representation was based on collective bargaining agreements between UTU and the respective railroads. One of the Board's recommendations, adopted as law in 102–29, was to designate the BLE as the exclusive representative for its members, thus appearing to eliminate UTU representation for grievance procedures.

UTU's claim in this case, by which it seeks to "preserve its historic right to represent" its engineer members, is a representational issue. UTU argues, to the contrary, that this claim is not a representational dispute with the BLE because UTU is simply seeking a judgment as to whether the railroads may refuse to allow UTU to represent its engineer members. However UTU manages that conclusion, it is clear to this Court that the question presented by UTU is whether it or BLE can represent the engineers at issue.

Representational disputes such as this are within the exclusive jurisdiction of the National Mediation Board. 45 U.S.C. § 152, Third, Fourth and Ninth; *American Train Dispatchers Ass'n v. Burlington Northern R.R. Co.,* No. 91–1743, slip op. at 12 (D.D.C. Oct. 25, 1991). It has long been established that under the terms of the RLA, federal courts lack jurisdiction to decide issues of representation. *Switchmen's Union of North America v. National Mediation Board,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); *General Committee of Adjustment v. Southern Pacific Co.,* 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85 (1943). The absence of federal jurisdiction has even been found, more recently, in unconventional representational settings such as competing union representation after a merger, *Air Line Employees Ass'n, International v. Republic Airlines, Inc.,* 798 F.2d 967 (7th Cir.1986); *International Brotherhood of Teamsters v. Texas International Airlines, Inc.,* 717 F.2d 157 (5th Cir.1983); and representational issues arising from restructuring when only one union was involved, *Air Line Pilots Ass'n,*

*Int'l v. Texas International Airlines, Inc.,* 656 F.2d 16 (2d Cir.1981).

Although 102–29 does not, in itself, deprive the Court of jurisdiction, the UTU claim would require the Court to resolve a repre-. sentational issue that involves the RLA. Despite the insistence of UTU that this is a mere case of statutory construction, the statutes in question are 102–29 and the RLA and the question presented is clearly one of representation. As the Court of Appeals has instructed the exercise of jurisdiction in such a case would contravene the teaching of the Supreme Court and the policy goals of the RLA. *Association of Flight Attendants v. Delta Air Lines,* 879 F.2d 906, 913 (D.C.Cir. 1989). The issue of representation by UTU and/or BLE effects the nature of negotiations between the railroads and the union and UTU's rights under the RLA. *American Train Dispatchers Ass'n, supra,* No. 91–1743, slip op. at 15. This claim falls outside the scope of federal court jurisdiction.

An order consistent with this Memorandum is being issued contemporaneously herewith.

### ORDER

Upon consideration of the parties' motions, oppositions, and replies, the entire record herein, and in accordance with the Memorandum issued contemporaneously herewith, it is this 20th day of December 1991

ORDERED that the motion for summary judgment of the plaintiff railroads be and it is hereby granted; and it is further

ORDERED that the motion to dismiss of the United States be and it is hereby granted; and it is further

ORDERED that the motion for partial summary judgment by the United Transportation Union be and it is hereby denied; and it is further

DECLARED that Pub.L. No. 102–29 does not violate the Commerce Clause or the Fifth Amendment of the Constitution; and it is further

DECLARED that Count II of the United Transportation Union is not within the jurisdiction of this Court.