Bisrat MEKURIA, et al., Plaintiffs,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.

Civil Action No. 96–866(GK).

United States District Court, District of Columbia.

June 30, 1997.

David A. Super, Jerome T. Tao, Ronald B. Vergnolie, Baker & Botts, Washington, DC, for Plaintiff.

Mable Chu, Assistant General Counsel, WMATA, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KESSLER, District Judge.

This matter comes before the Court on Defendant's Amended Motion to Dismiss [# 16].[1] Having considered Defendant's Motion, Plaintiff's Opposition, Defendant's Reply, Plaintiff's Surreply, the contentions of counsel at oral argument,[2] and the entire record herein, the Court **denies** Defendant's Motion for the reasons set forth below.

Plaintiffs Bisrat Mekuria, Tewidros Estafanos, Ace Cash Express, Inc., Ghirmai Ghebremichel, George Beckford, Carlton Henry

---

1. Plaintiffs filed their Complaint in this action on April 24, 1996. After Defendants had filed a Motion to Dismiss the original Complaint and Plaintiffs had responded in opposition to that motion, Plaintiffs filed an Amended Complaint on June 20, 1996. Defendants responded with a Reply to Plaintiff's Opposition to WMATA's Motion to Dismiss and Amended Motion to Dismiss ("Def.'s Mot.") [# 16]. Defendant's Amended Motion to Dismiss is currently before the Court. Unless otherwise indicated, any references in this Memorandum Opinion are to the Amended Complaint, Defendants' Amended Motion To Dismiss, and the parties' Opposition, Reply, and Surreply thereto.

2. The Court appreciates the performance of counsel at the Motion Hearing. Both counsel were very well prepared, very responsive to the Court's many questions, and very helpful in their analyses.

and Francis Fabrizio, Jr., who own and operate small neighborhood businesses in the Petworth area,[3] claim that Defendant Washington Metropolitan Area Transit Authority ("WMATA") has taken their property without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs assert a claim of inverse condemnation against WMATA arising out of WMATA's construction of the "Georgia Avenue/Petworth" Metro-rail station near New Hampshire Avenue between Park Road and Randolph Street, N.E. Plaintiffs seek compensation for property allegedly taken by Defendant in connection with this construction, as well as attorneys' fees and costs.

## I. Factual Background[4]

In August of 1993, WMATA, with a private construction company acting as its agent, began construction of a new Metro-rail station ("Metro Station") to be located in the vicinity of Georgia Avenue and New Hampshire Avenue between Park Road and Randolph Street. This construction has involved closing and excavating portions of both Georgia Avenue and New Hampshire Avenue. Am. Compl. ¶ 13. Plaintiffs all own or lease commercial property adjoining or abutting the portions of New Hampshire Avenue under construction. Am. Compl. ¶ 4–11.

Prior to beginning construction, WMATA acquired through formal condemnation proceedings several properties adjacent to the construction site, on the Western side of New Hampshire Avenue. Defendant did not, however, formally condemn any of Plaintiffs' properties. Am. Compl. ¶ 16.

The construction site occupies the entire width of New Hampshire Avenue and runs for approximately 920 feet, or the equivalent of approximately three city blocks. Am. Compl. ¶ 14. A nine foot high chain link fence topped with barbed wire surrounds the entire construction site, including both the excavation area itself and other additional areas used for construction equipment and associated facilities. Am. Compl. § 21. This fence runs within one foot of the edge of the pedestrian sidewalks in front of Plaintiffs' properties. Am. Compl. ¶ 14. Plaintiffs believe that the portion of New Hampshire Avenue currently under construction is expected to remain closed until 1998.[5] Am. Compl. ¶ 15.

New Hampshire Avenue is a major thoroughfare running through the Petworth section of Washington. Before the beginning of this construction, Plaintiffs relied upon use of New Hampshire Avenue for access to their businesses. Pedestrian and vehicular traffic along New Hampshire Avenue provide a significant portion of Plaintiffs' customers and clients. In addition, prior to commencement of construction, large shipments of goods and supplies were typically delivered by trucks and other vehicles that parked along New Hampshire Avenue next to Plaintiffs' stores. Am. Compl. ¶ 17.

Because of the obstruction caused by the construction site, there is currently no direct vehicular access whatsoever to Plaintiffs' properties from New Hampshire Avenue. In addition, pedestrian access to the properties from New Hampshire Avenue is restricted to a "circuitous, uneven pedestrian sidewalk". Am. Compl. ¶ 21. The sidewalk is "fifteen feet at its widest to about four feet at its narrowest, with an average width of between six and nine feet." Am. Compl. ¶ 21.[6]

---

3. The neighborhood businesses owned and operated by Plaintiffs include Mr. Mekuria's convenience store, Asier Grocery Store, Ace Cash Express, Georgia Beauty Supply, the Sweet Mango Cafe, and Hugh Electronics. *See* Compl. ¶¶ 5–12. In addition, Plaintiff Francis Fabrizio owns several properties on New Hampshire Avenue, which he rents to some of the Plaintiffs. *See* Compl. ¶ 12.

4. For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. *Shear v. National Rifle*

Ass'n of Am., 606 F.2d 1251, 1253 (D.C.Cir. 1979). Therefore, the facts set forth herein are taken from Plaintiff's Complaint. It was very clear from oral argument that many of Plaintiffs' most central factual contentions are strongly disputed by Defendant.

5. At oral argument, Defendant stated that the construction will be finished by the Fall of 1997.

6. At oral argument, Plaintiff stated that much of the sidewalk was only three to five feet wide. Even though WMATA did dispute many of the

Vehicles have access to Plaintiffs' properties only through four indirect routes: (1) through Randolph Road, north of the construction site; (2) through the intersection of Quincy Street and 8th Street; (3) through Rock Creek Church Road; and (4) through Georgia Avenue, south of the construction site. Am. Compl. ¶ 20. All four of these alternate routes present obstacles to access by pedestrians or vehicles or both. These obstacles include, *inter alia*, the fact that Plaintiffs' properties are not visible from these routes; that pedestrians must travel long, circuitous distances along narrow sidewalks and around many obstacles including construction vehicles, machines, and equipment; and that one of these narrow residential streets is a one-way dead-end street unusable by vehicles. *See* Am. Compl. ¶¶ 22–49.

Since construction of the Metro Station began, the United States Postal Service has refused to provide mail service and local suppliers of *The Washington Post* have refused to deliver newspapers to Plaintiffs' properties, citing the lack of street access as their reasons. Am. Compl. ¶¶ 59–60. Both Plaintiff Mekuria's convenience store and the check cashing business operated by Plaintiff Ace Cash Express, Inc., have closed and the properties where the businesses were located have been vacated. Am. Compl. ¶ 66. In addition, Plaintiffs' other businesses have suffered decreases in business revenues ranging from 70% to 90%. Am. Compl. ¶ 67.

The construction by WMATA has caused physical damage to several of Plaintiffs' properties including cracked walls, ceilings, and floors, and flooding with dirty sewer water flowing from the construction site. Am. Compl. ¶ 69. Plaintiffs also allege that the construction site has prevented police from adequately patrolling the area and resulted in an increase in incidents of robbery and vandalism, which have in turn led to increases in and cancellations of Plaintiffs' insurance policies. Am. Compl. ¶¶ 70–72.

Plaintiffs allege that Defendant's actions at the construction site have deprived them of their right to reasonable access to their properties and thus eliminated all viable economically beneficial or productive uses of their properties. They claim they cannot put their properties to beneficial commercial use because the construction site prevents potential customers from seeing and entering the properties and prevents suppliers from delivering necessary supplies. The same obstacles, Plaintiffs argue, prevent these properties from being put to reasonable residential use. In addition, Plaintiffs claim, the construction has virtually destroyed the fair market value and rental value of the properties. Plaintiffs claim that they have been singled out by Defendant for "particular, individualized adverse treatment" in that owners of other properties in the vicinity of the construction site have either received compensation through formal condemnation proceedings or have maintained reasonable access to their properties throughout the construction. Am. Compl. ¶ 78.

Plaintiffs argue that Defendant's actions have: (1) taken from Plaintiffs the valuable property right of reasonable access to their properties, without providing just compensation for such property; (2) have denied Plaintiffs all viable economically beneficial or productive use of their properties; and (3) interfered with Plaintiffs' distinct, investment-backed expectations in their properties, including the specific expectation that their properties would be afforded reasonable street and pedestrian access.

Defendants argue that Plaintiffs' Complaint should be dismissed under Fed. R.Civ.P. 12(b)(6) for failure to state a claim on which relief can be granted because (1) Plaintiffs fail to properly plead their claim of inverse condemnation; and (2) Plaintiffs' request for compensation is improper.

## II. Analysis

### A. Standard of Review

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gib-*

---

facts alleged by Plaintiffs, it did not dispute this aspect of Plaintiff's description of the site.

**4**

son, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). As previously noted, the factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff. *Shear v. National Rifle Ass'n of Am.*, 606 F.2d 1251, 1253 (D.C.Cir. 1979).

## B. Plaintiffs have stated a claim for inverse condemnation.

The Fifth Amendment provides that no 'private property shall be taken for public use without just compensation." U.S. Const. amend. V. The current state of the law on takings has evolved a great deal over time. In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Supreme Court first recognized that a landowner was entitled to compensation not only when the government physically appropriated private property but also in certain instances where the government regulated such property rights, stating that 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Mahon*, 260 U.S. at 414–15, 43 S.Ct. at 160. Over the seven decades since *Mahon*, the case law has defined, on a fact-specific basis, when government action does go "too far" within the meaning of the Fifth Amendment, and therefore constitutes a compensable taking. In recent years, for example, the Supreme Court has held that temporary takings, whether by physical intrusions or regulation, are compensable. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987).

In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798, (1992), the Supreme Court summarized its takings jurisprudence, dividing the cases into two separate categories: physical takings resulting from physical invasions of a property owner's land and regulatory takings "where regulation denies all economically beneficial or productive use of land". *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893. The Court emphasized, however, that in the context of regulatory takings the Court had never developed a set formula for determining when government action has gone "too far" in depriving a landowner of the economic value of his property. *See id.*.

Lower courts have applied the general principles set out by the Supreme Court in conducting fact-specific analyses to determine whether a regulatory taking has occurred in an individual case. *See, e.g., Poorbaugh v. United States*, 27 Fed. Cl. 628, 631 (Fed.Cl.1993) ("It is not essential for the government to have actually taken physical possession of the property; a taking can occur simply when the government by its actions deprives the owner of all or most of his or her interest in the property") (citations omitted); *Foster v. United States*, 221 Ct.Cl. 412, 607 F.2d 943, 950 (1979) ("[I]n inverse condemnation cases ... the ultimate test is whether the Government action is such that it deprives the owner of all or most of his interest in his property ... The question of whether there is a fifth amendment taking cannot turn simply on general principles of law; it must be based on the particular circumstances of each case") (internal citations omitted).

■ As emphasized in *Lucas*, 505 U.S. at 1016, 112 S.Ct. at 2893–94, takings claims must be analyzed under the rubric of either physical or regulatory takings. *See Hall v. City of Santa Barbara*, 833 F.2d 1270, 1275 (9th Cir.1986) (discussing and distinguishing the two lines of Supreme Court authority and the relevant analysis under each). Physical occupation cases "are those where the government physically intrudes upon private property either directly or by authorizing others to do so". *Id.* A typical example of this kind of taking occurred when New York City authorized a telecommunications company to string cable and mount switchboxes on a private building. *See Hall* at 1275 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)). Regulatory taking cases, on the other hand, "are those where the value or usefulness of private property is diminished by regulatory action not involving a physical occupation of the property". *Id.* An example of this kind of case is *Lucas* itself where the Supreme Court held that a state law prohibiting a property owner from

building on his beach front property would constitute a compensable regulatory taking if the property owner was deprived of "all economically beneficial or productive uses" of his property, *Lucas*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, by being forced to "sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle", *id.* at 1019, 112 S.Ct. at 2895.

Plaintiffs in this case have alleged no physical intrusion upon their property. Therefore, this action must be analyzed as a claim for a regulatory taking, or inverse condemnation.[7]

The Supreme Court, in the seminal case *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and later in *Lucas*, 505 U.S. 1003, 112 S.Ct. 2886, has squarely addressed the standards 'courts must apply in inverse condemnation cases. Central to the Supreme Court's inverse condemnation jurisprudence is its recognition that the "Fifth Amendment's guarantee ... [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the people as a whole". *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659 (quoting *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). The Court acknowledged, however, that it "quite simply, has been unable to develop any set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. Indeed, the Court emphasized the fact-specific nature of the inverse condemnation analysis, noting that "whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely 'upon the particular circumstances [in that] case.' " *Id.* (quoting *United States v. Central Eureka Mining Co.*, 357

U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958)).

█ After reviewing previous case law, the Supreme Court identified three factors to be considered in determining whether there has been a regulatory taking and landlords must be compensated. These factors are: the character of the government action, the economic impact of the action upon the property owner, and the extent to which the regulation has interfered with the property owner's distinct investment-backed expectations. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659.

█ When we examine Plaintiff's Complaint, we see that it alleges facts which, if proven, would satisfy the three factors set forth in *Penn Central*. First, Plaintiffs allege that WMATA, by virtue of the manner in which it is constructing the Green Line, has eliminated all direct vehicular access to their properties—thus resulting in loss of mail, newspaper delivery, and delivery of necessary supplies—and has destroyed all reasonable pedestrian access to their places of business. Second, because of the character of this government action, Plaintiffs allege that two of their properties "cannot be put to any economically beneficial or productive use". Compl. ¶ 54. In addition, Plaintiffs allege they have suffered severe economic injury consisting of the closing of two businesses, Mr. Mekuria's convenience store and Ace Cash Express, Inc., and severe loss in revenue by the other five businesses. *See id.* Third, Plaintiffs allege that WMATA's actions interfered with their "investment-backed expectations", i.e., the hope of obtaining a reasonable return on their investment. *See* Compl. ¶ 65–68, 70–72, 80; *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659 (identifying "investment-backed expectations" as one of the three most significant factors in a regulatory taking claim). Thus, Plaintiffs have directly alleged facts which fit squarely within the *Penn Central* analysis and therefore have stated a cause of action under the most recent case law from the Supreme Court. Defendant's Motion to Dismiss must be denied.

---

7. The term "inverse condemnation" is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted". *United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980).

Defendant's basic defense is that this case would be dismissed under pre-existing case law, and that *Penn Central* is inapplicable.

Initially, WMATA seeks to distinguish *Penn Central* on the ground that it was a zoning case whereas this case, by contrast, involves public works construction. The Court finds this argument unpersuasive since *Penn Central* makes it clear that the Supreme Court was setting forth general principles to be applied in all regulatory takings cases. Moreover, the regulatory takings principles of *Penn Central* and its progeny have been applied in a number of non-zoning contexts by both federal and state courts. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (coal mining statute); *Burlington N. R.R. Co. v. United Transp. Union,* 822 F.Supp. 797 (D.D.C.1991), *aff'd sub nom United Transp. Union v. United States,* 987 F.2d 784 (D.C.Cir.1993) (statute requiring railroads and union to negotiate regarding proposed changes in number of personnel employed on trains); *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884 (Fed.Cir.1983) (action by United States Corps of Engineers preventing landowner from mining precious metals); *The Mill v. State of Colorado,* 868 P.2d 1099 (Colo.Ct. App.1993) (State restrictions on use of property amounted to regulatory taking even though government action consisted of advisory letters from state agency rather than an actual regulation); *Carter v. City of Porterville,* 22 Cal.Rptr.2d 76 (Cal.Ct.App.1993) (allegation that city's construction of a dam constituted a taking because possibility of its collapse endangered landowner's property).

Second, WMATA argues that *Penn Central* does not apply because there was no governmental action—either regulatory or legislative—within the meaning of *Penn Central.* The simple answer to this argument is

that *Penn Central* can not be read so narrowly. For example, the Court explicitly refers to the possibility of compensable takings occurring as a result of a government's "public action" or "public program", neither of which necessarily require regulatory or legislative action. *See Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. Similarly, *First English* refers to "government action" which may constitute a taking. *See First English,* 482 U.S. at 314, 107 S.Ct. at 2385. Moreover, it makes no sense to limit *Penn Central* to apply merely to statutes and regulations, such as land use regulations, when there are myriad ways in which government action can seriously impact individual owners' use of their property.

Third, WMATA argues that this case does not involve a taking—physical or regulatory—but merely "impairment of access". That argument simply assumes the conclusion. Moreover, the Supreme Court makes no such distinction in *Penn Central, First English,* or *Lucas,* between compensable takings and non-compensable impairment of access. See generally *Lucas,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798; *First English,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250; *Penn Central,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631. To the contrary, as noted earlier, the Supreme Court has recognized only two distinct lines of takings cases—physical and regulatory. *See Hall,* 833 F.2d at 1275 (citing *Loretto,* 458 U.S. at 428, 102 S.Ct. at 3172). The fact that this case involves claims of "impairment of access" in no way removes it from the purview of the Supreme Court's regulatory takings analysis set forth in *Penn Central* and its progeny. Thus, the Court is not persuaded that it should ignore the teachings and analysis set forth in the three most recent Supreme Court cases in this area, and that it should deem them inapplicable.[8]

---

8. Even if the Court ruled to the contrary and looked to the so-called "impairment of access" cases relied on by WMATA, the three principal cases on which WMATA relies are readily distinguished. In *La Sangria, Inc. v. WMATA,* No. 916–73 (D.D.C. July 15, 1975), *aff'd,* 535 F.2d 1324 (D.C.Cir.1976), the court rejected a taking claim by a restaurant owner regarding WMATA's construction of a ventilation shaft which obstructed the sidewalk in front of the restaurant.

Although the ventilation shaft occupied a significant portion of the sidewalk, there remained a five-foot-wide passageway for pedestrians, *see La-Sangria* at *2, and, unlike this case, there was no allegation that vehicular access was similarly obstructed. Moreover, judgment was entered for WMATA after the facts were fully presented in a four day bench trial.

Finally, the cautionary words of the Ninth Circuit, in reversing a district court decision granting a Motion to Dismiss, are particularly instructive:

> It is axiomatic that "[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.". This admonition is perhaps nowhere so apt as in cases involving claims of inverse condemnation where the Supreme Court itself has admitted its inability "to develop any 'set formula' " for determining when compensation should be paid . . . resorting instead to "essentially ad hoc, factual inquiries" to resolve this difficult question . . . While dismissal of a complaint for inverse condemnation is not always inappropriate, such a dismissal must be reviewed with particular skepticism to assure that plaintiffs are not denied a full and fair opportunity to present their claims.

*Hall*, 833 F.2d at 1274 (citations omitted). The Court sees no justification for denying Plaintiffs in this case a "full and fair opportunity to present their claims".[9]

## III. Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss is hereby **denied.**

---

In *Anchorage Office Bldg. Co. v. WMATA*, No. 171–72 (D.D.C. Oct. 2, 1974), *aff'd* 527 F.2d 852 (D.C.Cir.1975), office building owners sought compensation for deprivation of their access to sidewalks and streets caused by WMATA construction. Just as in *La Sangria*, however, the court granted WMATA's motion to dismiss only after plaintiffs had the opportunity to present evidence at trial. *See Anchorage Office Bldg*, at *1. Plaintiffs failed to show sufficient deprivation of access to constitute a taking because even though direct access to the building from Connecticut Avenue along Que Street had been cut off, there was such access to the building from 19th Street throughout the period of construction. *Id.* at *4.

Finally, *Meyers v. District of Columbia*, 17 F.R.D. 216 (D.D.C.1955) involved a takings claim by owners of businesses near Dupont Circle who sought to recover damages caused by "interference with access" to their shops during construction of an underpass. See *Meyers*, 17 F.R.D. at 217. In *Meyers*, decided more than two decades prior to *Penn Central*, the court does not discuss the location or extent of the construction which plaintiffs claim obstructed access to businesses. Instead, the court described the construction as analogous to a "change of grade in the street", *Meyers* at 217, and summarily stated that consequential damages to property owners from diminution of business due to a public construction project are "damnum absque injuria and unfortunately must be borne by the individual as part of the price that he pays for being a member of organized society and living in an urban community". *Meyers*, 17 F.R.D. at 217. Thus, *Meyers* clearly did not consider the central Fifth Amendment concern, as discussed in *Penn Central*, that some people must not be forced to pay a disproportionate share of that price. *See Penn Central*, 438 U.S. at 123, 98 S.Ct. at 2659.

9. WMATA, in its Motion to Dismiss, has asked the Court to define the proper measure of the damages claimed by Plaintiffs. It would be premature to address, at this time, what is essentially a motion in limine seeking to limit the type of evidence that can be used to establish the fair market value of Plaintiffs' lost right of access.