[No. 55908-7-I.   Division One.   August 7, 2006.]

THE CENTRAL PUGET SOUND REGIONAL TRANSIT AUTHORITY, *Respondent*, v. THE HEIRS AND DEVISEES OF JACK K. EASTEY ET AL., *Appellants*.

448

*Charles K. Wiggins* and *Shelby R. Frost Lemmel* (of *Wiggins & Masters, P.L.L.C.*), for appellants.

*Larry J. Smith*, *Estera F. Gordon*, and *Matthew R. Hansen* (of *Graham & Dunn, P.C.*), for respondent.

¶1 BECKER, J. — Sound Transit condemned a small strip of land to expand its right of way in front of Jack's Auto Parts, Inc., a store owned by the heirs of Jack Eastey. The Eastey interests offered relevant evidence tending to prove it was the take, not loss of access to the right of way, that would force them to move customer parking and the entrance from the front of the store to the side. Because the trial court's erroneous decision to exclude this evidence was prejudicial to the determination of just compensation, we reverse and remand for a new trial.

## FACTS

¶2 Sound Transit owns a right of way along Martin Luther King (MLK) Way South in the Rainier Valley. Transit made plans to widen MLK Way and put in a new sidewalk in connection with a light rail project. MLK Way runs north and south. The Eastey property is to the west. Between the auto parts store and the Transit right of way, running parallel with MLK Way, is a strip of Eastey land approximately 24 feet wide. Transit condemned a strip of this strip, bringing its right of way closer to the store by a varying width of 6 inches to 3.25 feet.

¶3 Before the take, customers parked in front of the store in spots located entirely on the Eastey property. The customers typically used the unoccupied Transit right of way to turn directly into these spots and park facing the building at a right angle. Once the right of way is occupied by the twin tracks of the light rail line, new sidewalks, and other improvements, the privilege of using it to maneuver into the existing parking spots will no longer be available.

¶4 Eastey sought to be compensated for loss of parking. The parties debated how much it would cost to relocate

parking to the side of the store and reconfigure the entrance. And more significantly for this appeal, they debated whether Transit was obligated to compensate Eastey for having to move the parking. Transit took the position that relocation of the parking spots was made necessary not by the taking of the narrow strip but by loss of the ability to use the right of way, a privilege that is not compensable.

¶5 Another major compensation issue was Eastey's claim that the installation of a "pocket track" near the condemned strip would cause damage to the remainder of the Eastey property by generating noise and dust and obstructing the view. The purpose of the pocket track is to allow light rail trains to change directions from southbound to northbound. Transit did not view this as a compensable item.

¶6 Largely because of the different positions taken by the parties on these two issues, they were far apart in settlement negotiations. Transit originally offered $200,000, an offer that expired by its terms when the trial date was continued. Robert Bonjorni, an appraiser retained by Eastey, estimated the just compensation amount at $731,448, including amounts attributable to the parking cure and the pocket track. The case was reset for trial beginning January 18, 2005. Transit made a pretrial motion to exclude evidence of damages attributable to the parking cure and the influence of the pocket track. While this motion was pending in King County Superior Court, Transit made another offer of $327,600. A few days later, the court ruled in favor of Transit on both issues. Upon learning of the court's ruling, Transit sent a letter revoking the offer—just before Eastey sent a letter accepting it.

¶7 The case came on for trial. Ruling that Transit had effectively revoked its offer, the court denied Eastey's motion to enforce it. The parties waived jury and tried the case to the bench. The court determined that just compensation was $83,133.80. Eastey then moved for an award of attorney fees under RCW 8.25.070, based on the theory that

Transit had not made a valid offer. The court denied this motion.

¶8 Eastey seeks reversal of the rulings made in connection with the offer of settlement, as well as the ruling excluding evidence on the two contested damages issues. Eastey asks to be given the option to choose either a new trial, based on reversal of the ruling excluding evidence, or relief based on the settlement offer of $327,600, in the form of the right to accept it or, alternatively, an award of trial and appellate attorney fees under RCW 8.25.070.

## SETTLEMENT OFFER

¶9 The statute providing for an award of attorney fees to the condemnee in an eminent domain proceeding is designed to ensure that each side makes a good faith effort to settle. *Olympic Pipe Line Co. v. Thoeny*, 124 Wn. App. 381, 399, 101 P.3d 430 (2004). To be eligible for an award of reasonable attorney fees and expert witness fees, the condemnee must stipulate to immediate use and possession of the property by the condemnor early in the proceeding. *See* RCW 8.25.070(3). A condemnee who has complied with that condition will receive an award of attorney fees and other costs if the condemnor fails to make any written settlement offer at least 30 days before the trial commences. RCW 8.25-.070(1)(a). And even if the condemnor makes a timely offer, the condemnee will still be awarded attorney fees if "the judgment awarded as a result of the trial exceeds by ten percent or more the highest written offer in settlement submitted to those condemnees appearing in the action by condemnor in effect thirty days before the trial." RCW 8.25-.070(1)(b).

¶10 Eastey stipulated to immediate possession. Trial was set to begin on January 18, 2005. The hearing on Transit's motion to exclude evidence on the two contested damages issues was at 10:00 AM on Friday, December 17, 2004. After hearing oral argument, the court took the two motions under advisement and said a decision would not be

issued until "the early part of the following week."[1] Trial was only 32 days away. To have a qualifying offer in place that might avoid the obligation of paying Eastey's attorney fees, Transit could not wait to find out how the court would rule.

¶11 At 3:51 PM on Friday, December 17, Transit faxed and mailed Eastey an offer of $327,600. The offer stated: "This offer shall remain open until accepted or rejected, or until the close of business on Friday, January 14, 2005."[2]

¶12 Eastey did not become aware of the offer until the following Monday, December 20. Counsel for Eastey had closed his office for a Christmas party by the time Transit faxed its offer on Friday afternoon. Early Tuesday morning, both parties received copies of the orders granting Transit's motions. The rulings had the effect of shrinking the value of Eastey's case well below the offered amount. By 10:26 AM Tuesday morning, Transit had revoked its offer by fax, mail, and e-mail.[3]

¶13 At 12:36 PM that same day, counsel for Eastey faxed and mailed a letter purporting to accept the offer. The letter stated: "The terms of the Offer were specific that it would 'remain open until accepted or rejected, or until the close of business on Friday, January 14, 2005.' "[4]

¶14 Before trial, Eastey moved to compel enforcement of the "settlement agreement."[5] Transit maintained that the offer was validly revoked before the acceptance was communicated. The court denied the motion: "it is very basic contract law that parties are entitled to withdraw an offer."[6] Eastey assigns error to that decision.

---

[1] Clerk's Papers (CP) at 340.

[2] CP at 316.

[3] CP at 321.

[4] CP at 318.

[5] CP at 324.

[6] Report of Proceedings (RP) (Jan. 18, 2005) at 17.

¶15 Basic contract law is that an offer "may be revoked by the offeror at any time prior to the creation of a contract by acceptance." 1 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 5.8, at 666 (4th ed. 1990); *Brown Bros. Lumber Co. v. Preston Mill Co.*, 83 Wash. 648, 655, 145 P. 964 (1915). An offeree's power of acceptance is terminated "when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract." RESTATEMENT (SECOND) OF CONTRACTS § 42 (1981).

¶16 Eastey, however, contends that a settlement offer intended as a qualifying offer under RCW 8.25.070 contains an implied term that it will remain open for a reasonable time to permit the condemnee to evaluate and accept or reject the offer. This argument is based on dicta in *State v. Costich*, 152 Wn.2d 463, 98 P.3d 795 (2004). In *Costich*, the condemnor made the offer 34 days before trial, but held it open for only 10 days. The court rejected an argument that to satisfy the statute's 30-day requirement it was necessary to hold the offer open for 30 days. The phrase "in effect thirty days before the trial" refers to "temporal proximity," not duration. *Costich*, 152 Wn.2d at 478-79. That is, in order to satisfy the statute, the offer must be in effect on the 30th day before trial, but need not be in effect for a 30-day period. Nevertheless, the court suggested, "There may be factual scenarios where the State's hasty withdrawal of its settlement offer might be enough to invalidate it, but we do not opine when or if those circumstances exist." *Costich*, 152 Wn.2d at 479. Eastey argues that Transit's hasty withdrawal of its settlement offer three days after it was made brings it within the *Costich* dicta and requires that the revocation be invalidated and the offer deemed accepted.

¶17 The court below found that Transit acted in good faith in revoking the offer. Eastey's contention that more time was needed to consult and evaluate does not persuasively refute this finding. Eastey had more than three days to consider the offer, at a time when the legal arguments

were well defined and both sides knew how much was riding on the court's ruling. Once the court ruled, both parties had the same opportunity to act. The fact that acceptance of the offer was communicated by Eastey just two hours after the offer was revoked by Transit suggests that the acceptance could have just as easily been communicated the day before, or three hours before, except that Eastey had decided to risk waiting for the court's ruling. Assuming that *Costich* may call for a condemnor to hold an offer open for a reasonable time under RCW 8.25.070, we conclude Transit did so.

██ ¶18 Eastey acknowledges that an offer is generally revocable even though it expressly states the contrary. RESTATEMENT (SECOND) OF CONTRACTS § 42 cmt. a (1981). This is because a promise not to revoke an offer, like all promises, requires consideration. *Hill v. Corbett*, 33 Wn.2d 219, 222-23, 204 P.2d 845 (1949). Eastey contends the stipulation to Transit's immediate possession of the property provided the necessary consideration. But to constitute consideration, a performance or a return promise must be bargained for. *Labriola v. Pollard Group, Inc.*, 152 Wn.2d 828, 833, 100 P.3d 791 (2004) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 71(1) (1981)). By stipulating to immediate possession, Eastey became eligible for an award of attorney fees if Transit made a qualifying offer and other conditions were met. The statute does not demand that the offer be kept open for a particular period of time, and the record does not show that Eastey bargained for the promise to keep it open. Because there was no consideration, Eastey could not justifiably rely on the fact that the offer was stated in terms of remaining open until accepted or rejected or until January 14. The trial court did not err in holding that Transit effectively revoked its statutory offer.

██ ¶19 Eastey alternatively contends that if the revocation of the offer was effective, then Transit did not have an offer "in effect" 30 days before trial as is required under the statute to avoid incurring the obligation to pay the condemnee's attorney fees. RCW 8.25.070(1)(a). But the

settlement offer of $327,600 was in effect 32 days before trial and for the next 3 1/2 days. Revoking it 3 1/2 days after it was made did not mean it never existed. Eastey could have accepted it at any time until it was revoked.

¶20 We conclude that Transit had a qualifying statutory settlement offer in place 30 days before the trial. Because the judgment obtained by Eastey did not exceed the offer, the trial court correctly denied Eastey's request for an award of fees.

## DAMAGES ISSUES

¶21 When private property is taken for public use, our constitution requires payment of "just compensation." WASH. CONST. art. I, § 16. The condemnee is entitled to be put in the same monetary position as he would have occupied had his property not been taken. *Lange v. State*, 86 Wn.2d 585, 589, 547 P.2d 282 (1976). Just compensation is the difference between the fair market value of the entire tract before the acquisition and the fair market value of the remainder after the acquisition. *State v. McDonald*, 98 Wn.2d 521, 526, 656 P.2d 1043 (1983). Compensation is due for damage "caused to the remainder by reason of the taking," offset by any special benefits accruing to the remainder by virtue of the project which necessitated condemnation. *City of SeaTac v. Cassan*, 93 Wn. App. 357, 361, 967 P.2d 1274 (1998). A loss of value to the land that is not taken is referred to as "severance damages." *Shields v. Garrison*, 91 Wn. App. 381, 388 n.2, 957 P.2d 805 (1998).

### Project Influence Ruling

¶22 Eastey wanted to present evidence that the value of his remaining property would decrease by 10 percent due to noise, dust, and lost visibility caused by the presence of the pocket track nearby. In granting Transit's motion, the court excluded evidence of any "alleged influ-

ence on the fair market value of the property from the presence of the project in respondents' neighborhood."[7]

¶23 This ruling was correct. The noise, dust, and lost visibility that will potentially be present cannot be attributed to the taking of the narrow strip of land in front of the Eastey store.

¶24 Eastey contends the alleged damage to his remaining property is compensable simply because the pocket track is part of the same overall light rail project that justified the taking of the strip. Our Supreme Court rejected a similar claim in *Sultan Water & Power Co. v. Weyerhaeuser Timber Co.*, 31 Wash. 558, 561-62, 72 P. 114 (1903). The Water and Power Company took a right of way along a river, which it also planned to dam. Damming the river would potentially make it more difficult for Weyerhaeuser, a neighboring timber owner, to float logs down the river. Weyerhaeuser claimed the right to be compensated for the resulting diminished value of all of its lots in the vicinity. But compensation for the reduced market value was available only for the lots from which land was taken for the right of way. Devaluation of other nearby lots was not compensable because "these damages do not flow from the taking or damaging of appellant's lands."

> They flow from the obstruction of a highway, which appellant and all others who will be damaged in the same way, if at all, are privileged to use. If appellant owned no lands, but was engaged in logging, buying, and floating logs down the Sultan river from above this dam to the market, it would be injured in the same way, and probably to the same extent, as it now claims it will be injured. Yet under such circumstances no one would claim that appellant would be a necessary, or even a proper, party to an action to condemn lands on which to build a dam across the river. Nor would it be necessary that damages be assessed and paid to appellant before respondent could build the dam. An adjudication of damages in this case will not be an

---

[7] CP at 304.

adjudication of injuries which may arise in regard to the navigation of the river.

*Sultan*, 31 Wash. at 563.

¶25 Similarly, damage to the Eastey property caused by the presence of the pocket track on nearby land does not flow from the taking of the narrow strip of Eastey land. It flows from a use that Transit is legally making of other land, and the damage to Eastey is no different than the damage, if any, to the rest of the neighborhood. *See also 8,960 Square Feet v. Dep't of Transp. & Pub. Facilities*, 806 P.2d 843, 845-46 (Alaska 1991) (allowing compensation for lost visibility based on changes to taken parcel but not for similar changes made on existing right of way); *Campbell v. United States*, 266 U.S. 368, 372, 45 S. Ct. 115, 69 L. Ed. 328 (1924) (Just compensation to an owner, a part of whose land is taken for public use, "does not include the diminution in value of the remainder caused by the acquisition and use of adjoining lands of others *for the same undertaking.*" (emphasis added)).

¶26 If Transit had merely installed the pocket track without taking any of Eastey's property, damages caused to Eastey by noise and dust from the pocket track would not be compensable as a taking. The fact that a narrow strip of the Eastey property near the track was taken does not change that outcome. The narrow strip will be used for part of the sidewalk along MLK Way. If use of the sidewalk would damage the remainder of the Eastey property, severance damages might be appropriate under the authorities discussed above, but Eastey claims damages attributable only to the pocket track, not sidewalk use.

¶27 Also on point is *Pierce v. Northeast Lake Washington Sewer & Water District*, 123 Wn.2d 550, 562, 870 P.2d 305 (1994). In *Pierce*, the utility district constructed a water tank 30 feet high on its own property. The unsightly tank impaired the mountain view from a home located 50 feet away. The homeowners alleged the presence of the tank lowered their property value and sued for inverse condemnation. Their claim was properly dismissed. Our constitu-

tion does not authorize compensation merely for depreciation in market value when caused by a legal act. *Pierce*, 123 Wn.2d at 562.

¶28 *Shields*, relied upon by Eastey, does not contradict our conclusion. In that case, the condemnee received severance damages for loss of privacy and view caused by construction of a road *over the condemned property*. *Shields*, 91 Wn. App. at 388. Eastey urges a literal reading of the court's definition of severance damages as "harm to the remaining parcel that will be caused by the project for which the part taken is condemned." *Shields*, 91 Wn. App. at 388. Because the light rail is the project for which the Eastey strip was condemned, Eastey argues that *any* harm caused by *any* part of the light rail to Eastey's remainder is compensable under *Shields*. But in light of other authority, *Shields* cannot be read that broadly. Just compensation "must be calculated from the standpoint of what the property owner loses by having his property taken." *Lange*, 86 Wn.2d at 589. Severance damages are those "caused to the remainder *by reason of the taking*." *Cassan*, 93 Wn. App. at 361 (emphasis added). Eastey's potential exposure to the noise and dust of the pocket track is not a loss incurred by having the narrow strip taken.

¶29 We conclude the trial court properly excluded "project influence" damages.

## *Parking Cure Ruling*

¶30 Eastey also wanted to present evidence of the cost of reconfiguring the parking and remodeling the store so that customers would park and enter at the north end instead of in front where they parked before the take. The court's pretrial ruling excluded such evidence:

> The Court finds and concludes that substantial parking along the East side of the subject parcel currently exists because of respondents' use of the right of way, which use is a privilege that may be revoked; and that respondent's *access* to the subject property will not be substantially restricted by the taking that is here at issue; therefore, it is hereby

ORDERED, ADJUDGED AND DECREED that respondents may not present to the jury evidence, inference or argument (i) for damages to parking allegedly flowing from loss of use of the right of way or (ii) for damages or costs of upgrading or remodeling the retail building to the extent that such upgrade/remodel is necessitated by any change that may be made to the current parking patterns.[8]

Eastey assigns error to this ruling and to the court's refusal to revisit it during the bench trial. Although the trial court permitted Eastey to present the excluded evidence as an offer of proof, in the end the court did not incorporate the cost of the parking cure into the judgment of just compensation. The award of $83,133.80 was primarily for the fair market value of the strip taken and for a temporary construction easement.

¶31 The focus of the dispute is on part (ii) of the ruling which prevented Eastey from putting on any evidence of remodeling costs made necessary by changing the parking pattern. The parties agree that vehicles parking in the existing perpendicular stalls had to use the right of way for pulling in, backing up, and other maneuvers. They also agree Eastey will no longer be able to use this arrangement because his customers will no longer be able to use Transit's right of way. Eastey's loss of the use of the right of way is not compensable. *See Billington Builders Supply, Inc. v. City of Yakima*, 14 Wn. App. 674, 676-77, 544 P.2d 138 (1975) (owner of property abutting a public way had no property right in on-street parking); *see also Showalter v. City of Cheney*, 118 Wn. App. 543, 551, 76 P.3d 782 (2003) (no right to compensation for city-mandated removal of awning that had been allowed by license to rest on public sidewalk).

¶32 Transit insists that before the taking, there was no possible arrangement of parking in front of Eastey's store that would not have similarly relied on the use of MLK Way. Eastey, however, contends the trial court should have considered evidence tending to prove that before the take,

---

[8] CP at 310-11.

his property in front of his store was wide enough to accommodate angle parking for a reduced number of vehicles. He contends the angle parking arrangement would not have relied on MLK Way for parking maneuvers. A land use expert, Robert Thorpe, prepared schematic drawings showing that parking could be realigned within the pretaking property line in a configuration that would provide 28 parking spaces, most of them angled. According to Thorpe, loss of the condemned strip, though it was only three feet wide at most, was just enough to make the angled parking configuration impossible.[9]

¶33 Transit contends Eastey failed to preserve this argument. But the drawings were presented both pretrial and during trial, and the argument presented on both occasions was sufficient to call the court's attention to Thorpe's angle parking hypothesis.

¶34 It is true that Eastey at first characterized the loss of parking as damage to access.[10] The owner of land abutting an existing public way has a property right of ingress and egress, and is entitled to just compensation if this right is taken or damaged. *State v. Calkins*, 50 Wn.2d 716, 718, 314 P.2d 449 (1957). But as the trial court properly concluded in the pretrial order, the taking of the strip did not impair the ability of Eastey's customers to get onto Eastey's property from the right of way or to get out again.

¶35 Pressed by the court to demonstrate any impairment of access, counsel for Eastey admitted the take would not restrict access but argued the parking cure was compensable because "all of the parking along this front of the building is on private property."[11] Counsel continued that because of the taking "we can no longer park either

---

[9] CP at 273, 275.

[10] CP at 202.

[11] RP (Dec. 17, 2004) at 23.

this way, nor can we park at an angle along the front of the building."[12]

¶36 The court expressed doubt: "it seems to me it's hard to attribute the parking problem to the six inch take, which is the red line there. And it's more likely the full use of the right-of-way."[13] But while the Thorpe testimony and exhibits may have been less than conclusive on the subject of the feasibility of a pretake angled parking configuration independent of the right of way, it was substantial evidence that should have gone to the finder of fact. We have found no document in the record demonstrating that Thorpe was wrong or his drawings inaccurate.

¶37 The pretrial ruling erroneously excluded evidence of the cost of a parking cure. Eastey tried to get the trial court to look at the issue and made an offer of proof, including testimony by Thorpe, that an angle-parking arrangement would have been possible absent the taking.[14] But the court denied this request on the basis that the pretrial ruling was the law of the case.[15]

¶38 The Thorpe evidence tended to prove that angle parking was feasible before the take. If believed, it would show that the cost of moving the parking to the north was necessitated by the taking, not by the loss of use of the right of way.

¶39 The judgment is reversed. We remand for a new trial.

DWYER, J., concurs.

¶40 Cox, J. (concurring) — I agree that we must reverse and remand for a new trial. I write separately to focus on

---

[12] RP (Dec. 17, 2004) at 23-24.

[13] RP (Dec. 17, 2004) at 26. The court was apparently examining an illustrative exhibit that was also presented by Transit to this court for illustrative purposes at oral argument.

[14] RP (Jan. 18, 2005) at 159.

[15] RP (Jan. 19, 2005) at 75.

why the pretrial ruling and the subsequent refusal of the trial judge to revisit that ruling are incorrect.

*Parking Cure Ruling*

¶41 The court's pretrial ruling excluded evidence about the cost of reconfiguring the parking and remodeling the store so that customers could park and enter at the north end, instead of the east side where they parked before the taking. The provision of the court's order at issue states:

> "The Court finds and concludes that substantial parking along the East side of the subject parcel currently exists because of respondents' use of the right of way, which use is a privilege that may be revoked; and that respondent's *access* to the subject property will not be substantially restricted by the taking that is here at issue; therefore, it is hereby

> "ORDERED, ADJUDGED AND DECREED that respondents may not present to the jury evidence, inference or argument (i) for damages to parking allegedly flowing from loss of use of the right of way or *(ii) for damages or costs of upgrading or remodeling the retail building to the extent that such upgrade/ remodel is necessitated by any change that may be made to [the] current parking patterns.*"[16]

¶42 As the majority correctly observes, "[t]he focus of the dispute is on part (ii) of this ruling, which prevented Eastey from putting on any evidence of remodeling costs made necessary by changing" the " *'current parking patterns.'* "[17] "The parties agree that vehicles parking in the existing stalls that are perpendicular to the east wall of the building must use the right-of-way for pulling in, backing up, and other maneuvers. They also agree Eastey will no longer be able to use this arrangement because his customers will no longer be able to use Transit's right-of-way." And "Eastey's loss of the use of the right-of-way is not compensable."[18]

---

[16] Majority at 459-60 (emphasis added) (quoting Clerk's Papers at 310-11).

[17] *Id.* at 460 (emphasis added) (quoting Clerk's Papers at 310-11).

[18] *Id. "See Billington Builders Supply, Inc. v. City of Yakima,* 14 Wn. App. 674, 676-77, 544 P.2d 138 (1975) (owner of property abutting a public way had no

¶43 Eastey presented extensive evidence at the pretrial hearing that before the taking, angle parking for a reduced number of vehicles was possible on the east side of the building. He further argued that the angle parking would not have relied on MLK Way for parking maneuvers. A land use expert presented schematic drawings showing that parking could be realigned within the pretaking property line in a configuration that would provide 28 parking spaces, most of them angled, on the east side of the building. According to that expert, loss of the condemned strip, though it was only three feet wide at most, was just enough to make the angled parking configuration impossible.

¶44 But the pretrial ruling erroneously excluded evidence of the cost of a parking cure as evidenced by the above presentation. Specifically, the order bars evidence of damages for *"any change"* that may be made to the current parking patterns. Here, such evidence would have included the evidence that angled parking could have been accomplished without invading the adjacent right-of-way. Damages arising from this loss would not have been prohibited by controlling case law. In sum, the pretrial ruling was overly broad in excluding evidence that would have supported Eastey's claim for just compensation for loss of the potential to use angled parking on the east side of the building.

¶45 A different judge tried the case, and Eastey sought relief from that judge on this issue. The judge declined, stating that the pretrial ruling was the law of the case. The court did allow Eastey to submit the evidence as an offer of proof, and we have that evidence before us now on appeal.

¶46 The law of the case doctrine does not extend to this situation. In *MGIC Financial Corp. v. H.A. Briggs Co.*,

property right in on-street parking); *see also Showalter v. City of Cheney*, 118 Wn. App. 543, 551, 76 P.3d 782 (2003) (no right to compensation for city-mandated removal of awning that had been allowed by license to rest on public sidewalk)." *Id.*

Division Two of this court rejected a similar argument.[19] There, one judge made a pretrial ruling that denied the defendant's motion for summary judgment.[20] Several days later, on the same record, the trial judge granted the defendant's renewed motion for summary judgment.[21] In rejecting the argument that identical motions raised several times at the trial court level violated the law of the case doctrine, the court disagreed. The court stated that the doctrine generally applies only to parties who raise identical issues on successive appeals, not to identical issues raised several times before the trial court.[22]

¶47 Here, one judge made a pretrial ruling in limine. The trial judge was entitled to reconsider that ruling. The law of the case doctrine did not prohibit reexamination of the matter.

---

[19] 24 Wn. App. 1, 8, 600 P.2d 573 (1979).

