IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| TAPIO INVESTMENT COMPANY I, a | ) | |
| Washington limited liability company; | ) | No. 33684-1-III |
| MONARCH INVESTMENT; TAPIO | ) | |
| OFFICE IV PARTNERSHIP; | ) | |
| CLONINGER/EUCKER | ) | |
| PARTNERSHIP; PAMELA M. | ) | |
| CLONINGER, an individual, and | ) | PUBLISHED OPINION |
| CLONINGER & ASSOCIATES, LLC, a | ) | |
| Washington limited liability company, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE STATE OF WASHINGTON, by and | ) | |
| through the Department of Transportation, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Tapio Investment Company I and its affiliates[1] (collectively

"Tapio") filed an inverse condemnation lawsuit against the State of Washington

---

[1] Monarch Investment, Tapio Office IV Partnership, Cloninger/Eucker Partnership, Pamela M. Cloninger, and Cloninger Associates, LLC.

Department of Transportation for an alleged taking of Tapio's office park during construction of a major freeway project in Spokane. The approved route for the freeway includes a portion of the office park, which is situated partially within a planned interchange. Construction of the interchange will be one of the last steps in the decades-long construction process. The Department will not need Tapio's property for many years.

The case proceeded to a jury trial on Tapio's theory that while the Department had not physically or legally interfered with use of its property, Department publicity about the freeway project and its acquisition of nearby properties hampered Tapio's leasing activity and diminished the market value of the office park to an extent that had, by 2006, already effected a constitutional taking. At the close of Tapio's case the trial court granted the Department's CR 50 motion, ruling that Tapio's evidence was insufficient as a matter of law to support a claim for relief.

On appeal, Tapio abandons any request that we recognize a new type of inverse condemnation claim for taking by oppressive preacquisition conduct—one theory that it advanced in the trial court. It contends, instead, that its evidence was sufficient to support its claim of inverse condemnation under existing law. Because there has been no physical invasion of Tapio's land, no regulation restricting Tapio's use of its property, and the harm it complains of does not otherwise amount to a constitutional taking, we affirm.

2

No. 33684-1-III
*Tapio Investment Company I. v. State*

## FACTS AND PROCEDURAL BACKGROUND

What is commonly referred to in Spokane as the future North-South Freeway is a partially completed, 10.5 mile long, high-speed limited access freeway that will link U.S. Highways 2 and 395 with Interstate 90 in the city of Spokane. The approved route traverses a great deal of developed property, requiring that approximately 940 parcels of land be acquired. Among them is the Tapio Center, which is situated partially within a planned interchange at Interstate 90.

Tapio Center is a three-acre office park located near the Thor-Freya interchange on Interstate 90. Nine office buildings and one restaurant are positioned on the perimeter of the site in what one owner has described as a "circle the wagons" format, with a park-like setting in the protected interior. Report of Proceedings (RP) at 1012. Common parking is included in the landscaped center, to which there are presently eight entrances. The north portion of Tapio Center includes five buildings managed by their majority owner, the Cloninger family. The five buildings in the south portion are primarily owned by Dixon/Stejer family interests and are managed by John Stejer.

The freeway project's right-of-way plans call for complete removal of three buildings in the south portion of Tapio Center. Two others will be "clipped." RP at 562. Southern access to the office park will be eliminated and access and parking to the northern portion will be affected.

3

Construction of the freeway project is proceeding from U.S. Highway 395 on the north toward Interstate 90 on the south. Since Tapio Center is among the southern-most properties touched by the approved route, the Department will not need to acquire, physically affect, or regulate use of Tapio's property for many years.

The Department's initial budget request to fund the purchase of all properties needed for the freeway project was denied by the legislature. Instead, the legislature began providing partial acquisition funding of approximately $16 million each biennium. Funding for a particular biennium is not appropriated or tied to particular locations and may be used by the Department to acquire properties anywhere along the project right-of-way.

The Department's communication about the freeway project with affected persons has been extensive. Following initial environmental approval of the freeway project in the late 1990s, the Department had, by the time of the trial below, held over 100 public meetings to impart information and gather public input. It had communicated with every identifiable affected property owner, and continued to communicate with them as construction progressed toward their area.

Before commencing this inverse condemnation action in 2011, Tapio's owners had complained for years that publicity about the freeway project was worrying their tenants, hampering leasing activity, and making it difficult to plan for improvements and long-term maintenance expenditures. Concerns first expressed in writing in 1999 were

4

renewed in writing several times, and in additional meetings and conversations with Department representatives. The Cloninger family patriarch, Glen Cloninger, asked in 1999 that the Department make an early purchase of the properties in which his family was invested. In 2002, Mr. Stejer wrote to Timothy Golden, the Department's real estate manager for the North-South Freeway, asking that the Department "go ahead and initiate the necessary proceedings," to acquire the needed Tapio property in order to prevent further economic damage. RP at 401; Ex. 17.

In written responses to Tapio's correspondence, Department representatives explained that its public communication about the project was required by federal and state environmental regulations; that construction would not affect Tapio's property anytime soon and it did not expect to acquire Tapio's property for years; that when property was condemned, it would be valued as if there was never any freeway project; and that the Department's recommendation was that all property owners "maintain or enhance their properties as they see fit," because the Department "will consider all improvements and maintenance made to the property during the appraisal prior to purchase." RP at 819; Ex. 18.

By the end of 2003, the Department had acquired several properties in the area of Interstate 90, even though construction was still several miles north in the Wandermere area. The acquisitions included a vacant tavern and a daycare that were purchased due to owner medical and hardship reasons, as well as two church buildings. The Department

occasionally purchased residences in response to requests from homeowners that it purchase their homes, and East Central Neighborhood community leaders eventually lobbied for a verbal commitment from the Department to acquire residences when funding became available so families could relocate.

The Department's biennial acquisition budgets could have accommodated a purchase of the Tapio Center had the Department thought that was the best use of the funds available. As Mr. Golden would testify at trial, the Department's business practice is to look at all residential and commercial purchase requests and identify the best use of the available budget to maximize the number of parcels purchased. In the Interstate 90 area, it placed a priority on purchasing residential properties because acquiring single-family dwellings with yards was more cost effective and provided more total right-of-way for the amount expended than would acquiring commercial properties. For a time, the Department was also acquiring and removing structures along Interstate 90 to accommodate a plan to install noise walls. The plan was later dropped because of engineering uncertainties and funding issues. Commercial properties were purchased on a case-by-case basis if price, location, or surrounding circumstances presented a good business reason for deviating from the priority on residential purchases.

The Department purchased increasing numbers of residential properties in the Interstate 90 area from 2007 to 2011. By the time of trial in 2014, it had acquired about 300 parcels in the area, on both sides of the interstate and up and down blocks east and

6

west of Tapio Center. On many of the properties, structures were demolished and the land bulldozed for safety and maintenance reasons and to avoid problems with theft and transients. The Department spends about $100,000 annually for mowing and general maintenance of the lots that have been cleared.

In March 2010, Mr. Stejer sent another letter to Department officials, again complaining of publicity about the freeway plan and acquisition, and about the Department's demolition of neighboring properties. In a response that discussed legal requirements for notice and public participation and the funding and property acquisition demands of a large highway project, Regional Administrator Keith Metcalf informed Mr. Stejer that the Department did not anticipate construction would directly affect Tapio's property for at least 10 years.

Tapio filed its inverse condemnation action against the Department in November 2011. It contends that a taking of Tapio's property occurred in the fall of 2006 when the Department consciously started negotiating for the purchase of homes in the Interstate 90 area. After the denial of several dispositive motions, the case proceeded to trial in June 2014.

Tapio called eight witnesses, including four experts. Dewitt Sherwood, a licensed real estate appraiser, testified to his opinion that as a result of Department publicity and property acquisitions, the value of the Tapio Center had been diminished by 80 to 90

7

percent, with resulting damages of $8,510,000. His opinion assumed a taking in October 2006, the date given him by Tapio's attorneys.

Craig Soehren, a commercial real estate broker, testified that commercial brokers would be unlikely to bring potential tenants to Tapio in light of the published freeway plan and that he would not bring potential buyers to the property. He admitted he had no knowledge that the Department did anything different in pursuit of the North-South Freeway construction than it had done in other major projects, and agreed that Tapio still had the right to sell its property. He admitted that the Department's demolition of nearby homes had improved the look of the neighborhood.

Jeff Johnson, also a real estate broker, testified to his opinion that the Department's plans and acquisition activity in the vicinity of Tapio Center had affected its ability to obtain tenants, thereby affecting Tapio's ability to sell the office park. He acknowledged that Tapio remained legally able to sell or lease the property.

Cajer Neely, a commercial banker, testified that in light of the freeway plans and property acquisitions in the Interstate 90 area, it was unlikely a commercial bank would provide a loan to a potential purchaser of Tapio Center if it was secured only by the office park property.

Tapio also called two Department employees, Mr. Golden and Larry Larson (a project engineer on the North-South Freeway project) questioning them about the history

8

of the project, Tapio's communications with the Department, and the Department's property acquisitions in the Interstate 90 area.

Mr. Stejer and Blake Cloninger testified to the damages each was requesting on behalf of their owners' interests—collectively, $13.8 million—based on what each considered a total taking of Tapio Center in 2006. Mr. Stejer conceded the Department had imposed no rule that kept them from running their operations and that they retained the right to sell the property.

At the time of trial, an estimated 47 to 50 residential properties and 5 commercial properties (in addition to Tapio Center) remained to be acquired for the proposed Interstate 90 interchange.

At the close of Tapio's case, the Department moved to dismiss under CR 50(a). After hearing argument from the parties, the court granted the motion, finding that Tapio's theory of unwarranted delay or oppressive preacquisition conduct—a theory the court had allowed to proceed, but that has not yet been recognized by any reported Washington decision[2]—had not been demonstrated by its evidence.

---

[2] In *Orion Corp. v. State*, 109 Wn.2d 621, 671-72, 747 P.2d 1062 (1987), our Supreme Court declined to recognize a distinct inverse condemnation claim for a taking by oppressive preacquisition conduct. The court explained:

> Apparently, California has recognized a cause of action for inverse condemnation when a "diminution in market value resulted from 'unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation . . .'" *Jones v. People ex rel. Dep't of Transp.*, 22 Cal. 3d

In attempting to persuade the court to change its ruling, Tapio's lawyer reminded it of Tapio's proposed but as-yet unadmitted exhibit 35—a partial e-mail chain among Department employees that used the word "blight" in describing a concern about a property disposition outside of the Interstate 90 area. Tapio had tried to offer the partial e-mail through Mr. Stejer, but the court sustained an objection and ruled that its relevance would have to be demonstrated by someone like Mr. Golden, who had personal knowledge of its subject matter.

Tapio moved to reopen its case to recall Mr. Golden for the purpose of offering the exhibit. The court denied the motion on the basis that Tapio had rested its case.

Tapio sought direct review by the Washington Supreme Court of the judgment dismissing its complaint with prejudice. The Supreme Court transferred the appeal to us.

## ANALYSIS

At oral argument of the appeal, Tapio's lawyer began by stating Tapio was not asking us to recognize a new cause of action for oppressive precondemnation conduct, as the courts of some states have done. He stated Tapio's contention that the property rights

---

144, 151, 583 P.2d 165, 148 Cal. Rptr. 640 (1978) (quoting *Klopping v. Whittier*, 8 Cal. 3d 39, 500 P.2d 1345, 104 Cal. Rptr. 1 (1972)). . . .
    At this time, we do not choose to recognize this new cause of action.
The *Orion* court further commented that even if it had recognized the cause of action, the evidence in the case before it did not support it.

10

No. 33684-1-III
*Tapio Investment Company I. v. State*

it asserts and the damages it seeks to recover are available under Washington's existing

condemnation law.[3]

We review a trial court's decision on a CR 50(a) motion for judgment as a matter

of law using the same standard as the trial court. *Schmidt v. Coogan*, 162 Wn.2d 488,

491, 173 P.3d 273 (2007). A motion for judgment as a matter of law admits the truth of

the opponent's evidence and all reasonable inferences that can be drawn from it. *Queen*

*City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 126 Wn.2d 50, 98, 882 P.2d 703 (1994).

"Granting a motion for judgment as a matter of law is appropriate when, viewing the

evidence most favorable to the nonmoving party, the court can say, as a matter of law,

there is no substantial evidence or reasonable inference to sustain a verdict for the

nonmoving party." *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997).[4]

---

[3] The following argument appears at Washington Court of Appeals oral argument, *Tapio Investment Company I, et al v. State*, No. 33684-1-III (June 10, 2016) at 40 sec. through 1 min., 28 sec. (on file with the court):
> [T]his case was pled as an inverse condemnation claim. It was not pled as a separate abuse of the precondemnation conduct claim. That term however, does apply and identify the cause of the significant precondemnation damage that the plaintiffs suffered as a direct result of the state's inverse condemnation acts which specifically targeted the plaintiff's property for taking, acts which are not permitted under our state constitution.
>
> So we're not asking this court this morning to recognize this as a new cause of action, as some other states have done. That's because Washington law applicable to inverse condemnation, condemnation law in general, already supports the claim that we alleged in our complaint.

[4] Tapio emphasizes the trial court's pretrial denials of the Department's CR 12(b)(6) and summary judgment motions and this court's denial of discretionary review of the CR 12(b)(6) ruling as illustrating the presence of factual issues requiring a jury

11

## *I. Takings law: an overview*

The takings clause of the Fifth Amendment of the United States Constitution,

applicable to the States through the Fourteenth Amendment, prohibits the government

from taking private property for public use without just compensation. "The clearest sort

of taking occurs when the government encroaches upon or occupies private land for its

own proposed use," and decisions by the United States Supreme Court establish that

"even a minimal 'permanent physical occupation of real property' requires compensation

under the Clause." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 150 L.

Ed. 2d 592 (2001) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S.

419, 427, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982)).

In 1922, the United States Supreme Court recognized "there will be instances

when government actions do not encroach upon or occupy the property yet still affect and

limit its use to such an extent that a taking occurs." *Palazzolo*, 533 U.S. at 617 (citing

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922)).

"In Justice Holmes' well-known, if less than self-defining, formulation, 'while property

may be regulated to a certain extent, if a regulation goes too far it will be recognized as a

---

trial. And the Department contends that the trial court should have granted its motion to bifurcate and should have decided the issue of whether there was a taking first. The Department did not seek discretionary review of the denial of its motion to bifurcate.

The only decision whose correctness is presented by the appeal, and the only one that we need to address, is the trial court's decision to grant the CR 50(a) motion.

12

taking.'" *Id.* (quoting *Mahon*, 260 U.S. at 415). When a regulation restricts an owner's

use of its property but advances a legitimate state interest, courts balance the public

interest against the economic impact on the landowner using three factors identified in

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 57

L. Ed. 2d 631 (1978): (1) the regulation's economic impact on the property, (2) the extent

of the regulation's interference with investment-backed expectations, and (3) the

character of the government action. *Presbytery of Seattle v. King County*, 114 Wn.2d

320, 333, 335-36, 787 P.2d 907 (1990) (footnote omitted).

Article I, section 16 of the Washington Constitution states that "[n]o private

property shall be taken or damaged for public or private use without just compensation

having first been made." At oral argument, Tapio contended that this broader language,

speaking of "damage," means that neither a physical intrusion nor a regulatory taking is

required to trigger a right to compensation under the Washington Constitution.[5] Asked to

---

[5] The following argument appears at Washington Court of Appeals oral argument, *Tapio Investment Company I, et al v. State*, No. 33684-1-III (June 10, 2016) at 1 min., 28 sec. through 2 min., 7 sec. (on file with the court):

Our state constitution is rather unique. It's different than the federal constitution under the Fifth Amendment. "No private property shall be taken *or damaged*"—and those are the operative words that are applicable to this case and the decision that I believe we're asking you to make—"for public or private use without just compensation." . . . So our state constitution recognizes that you don't have to have a physical intrusion or a regulatory taking in order to trigger compensation.

identify any Washington decision that has held that no physical intrusion or regulatory

taking need be shown, however, counsel was unable to identify one.[6]

Professor Stoebuck has expressed the view that our state constitution—like 25

other state constitutions, beginning with that of Illinois—allowed compensation for

damaging as well as taking private property "to allow compensation in certain cases,

especially certain loss-of-street-access cases, in which most courts had been unwilling to

hold a taking had occurred." WILLIAM B. STOEBUCK, NONTRESPASSORY TAKINGS IN

WASHINGTON § 1.9, at 9 (1980) (citing, inter alia, *Brown v. Seattle*, 5 Wash. 35, 31 P.

313, 32 P. 214 (1892)). Tracing the erratic history of judicial construction of the "or

damaging" language in article I, section 16, he concluded, as of the time he was writing,

that any distinction between damaging and taking had been abolished. *Id.* at 10. Tapio

does not address this history nor any of the *Gunwall*[7] factors in suggesting that we rely on

an independent analysis of Washington's takings provision to find that no physical

invasion or regulation is required for a taking. We decline to do so and rely instead on

---

[6] He cited four cases when questioned, but three involved an alleged physical invasion and one concluded that in the absence of a physical invasion, there was no taking. *Phillips v. King County*, 136 Wn.2d 946, 957, 968 P.2d 871 (1998) (physical invasion: surface water runoff onto plaintiff's property); *Showalter v. City of Cheney*, 118 Wn. App. 543, 549, 76 P.3d 782 (2003) (physical invasion—removal of a canopy); *Pierce v. Ne. Lake Wash. Sewer Dist.*, 123 Wn.2d 550, 559, 870 P.2d 305 (1994) (action was properly dismissed because there was no physical invasion and, lacking an easement, property owner had no property "right to a view"); *Martin v. Port of Seattle*, 64 Wn.2d 309, 391 P.2d 540 (1964) (physical invasion—noise from low flying aircraft).

[7] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

14

existing case law. *Cf. Guimont v. Clarke*, 121 Wn.2d 586, 854 P.2d 1 (1993) (refusing to address the plaintiffs' contentions that the Washington Constitution provides greater protection from government takings of property where they did not brief the *Gunwall* factors).

A property owner may bring an inverse condemnation claim to "'recover the value of property which has been appropriated in fact, but with no formal exercise of the power of eminent domain.'" *Fitzpatrick v. Okanogan County*, 169 Wn.2d 598, 605, 238 P.3d 1129 (2010) (quoting *Dickgieser v. State*, 153 Wn.2d 530, 534-35, 105 P.3d 26 (2005)). To maintain an action for inverse condemnation, a plaintiff must show "(1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings." *Dickgieser*, 153 Wn.2d at 535.

A cause of action for inverse condemnation accrues when the landowner sustains any measurable loss of market value as a result of interference, physical or regulatory, with the use and enjoyment of its property. *Highline Sch. Dist. No. 401 v. Port of Seattle*, 87 Wn.2d 6, 548 P.2d 1085 (1976). But a loss of market value alone—even a loss of value attributable to government action—is not itself evidence that the government has interfered in a way that amounts to a constitutional taking. *Pierce v. Ne. Lake Wash. Sewer Dist.*, 123 Wn.2d 550, 562, 870 P.2d 305 (1994).

15

Legal acts that do not interfere, physically or by regulating use of private property, are not takings, and neither the Washington nor federal constitutions have been held to require compensation for depreciation in market value caused by such legal acts. *Id.* at 562 & n.55 (citing *Aubol v. Tacoma*, 167 Wash. 442, 446, 9 P.2d 780 (1932)); *Danforth v. United States*, 308 U.S. 271, 286, 60 S. Ct. 231, 84 L. Ed. 240 (1939) ("The mere enactment of legislation which authorizes condemnation of property cannot be a taking."); *Andrus v. Allard*, 444 U.S. 51, 66, 100 S. Ct. 318, 62 L. Ed. 2d 210 (1979) ("[A] reduction in the value of property is not necessarily equated with a taking" and "loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim."); *Kirby v. Forest Indus., Inc. v. United States*, 467 U.S. 1, 15, 104 S. Ct. 2187, 81 L. Ed. 2d 1 (1984) ("[I]mpairment of the market value of real property incident to otherwise legitimate governmental action ordinarily does not result in a taking.").

## II. *Tapio presented no substantial evidence of a taking*

At issue is whether, by the close of Tapio's case, there was substantial evidence or reasonable inference that would sustain a verdict that the Department had committed a taking of Tapio's property under the federal or state constitution, thereby requiring payment of compensation.

Messrs. Stejer and Cloninger conceded no governmental rule had been imposed on Tapio that had impeded its operations or otherwise prevented it from improving or

maintaining the property. Tapio's experts and Mr. Stejer acknowledged that Tapio still had the legal right to lease or sell the property. Tapio nonetheless argues that it did suffer damage from "regulatory conduct" in the form of a limited access order entered in 2005 and, alternatively, that neither physical invasion nor regulation is required for a taking.

A. The 2005 Final Limited Access Order does not
regulate Tapio's use of its property

Tapio contends that a Final Limited Access Order entered by the Department in 2005 (and the public notice and planning processes leading up to that order) is tantamount to an administrative regulation, justifying a regulatory takings analysis under the *Penn Central* factors. If entitled to *Penn Central* balancing, it claims to have demonstrated economic impact, interference, and a character of government action entitling it to relief.

The final limited access design for the freeway project was approved by the Department in 2005. Approval resulted in findings and an order related to the proposed right of way and access control plans.[8] But the undisputed evidence was that the plan had not yet been filed with the Spokane County Auditor. As a matter of state law, it had not yet restricted property owners in any way. Because of "the uncertainties of federal aid and the state level of funding of proposed construction or improvement of state

---

[8] The parties generally refer to this as the 2005 Limited Access Order. Although referred to by trial witnesses and in various exhibits, the document itself is not included in the record.

17

highways," the Department's plans for highway improvements "shall be deemed tentative until filed with the county auditor as authorized in RCW 47.28.025 or until the department commences action to condemn or otherwise acquire the right-of-way for the highway improvements." RCW 47.28.026(2). Unless and until the Department causes a plan of a proposed new highway or limited access facility to be recorded with the county auditor, nothing contained in highway construction provisions dealing with building and improvement prohibitions (RCW 47.28.025 or 47.28.026) "may be deemed to restrict or restrain in any manner the improvement, development, or other use by owners or occupiers of lands, buildings, or improvements within the limits of any proposed new or limited access highway or any proposed relocated or widened highway." *Id.*

As a matter of law, the Final Limited Access Order did not regulate Tapio's use of its property.

### B. "Government action" falling short of regulation does not trigger application of *Penn Central* balancing

Tapio nonetheless argues that

[i]t is the implementation of this Final Limited Access Order that has resulted in the damages to Tapio. For example, the acquisition and construction in the immediate neighborhood [i]s provided for by those plans. [The Department] went beyond *"planning"* when it adopted through the regulatory process the Final Limited Access plan and began acting in accordance with it.

Br. of Appellant at 38-39.

18

Tapio represents that "[n]umerous other jurisdictions" have affirmed that the focus of the inquiry in analyzing whether a *Penn Central* taking has occurred is not on regulation but on the "government's action itself," but it identifies only one decision— *Mekuria v. Washington Metropolitan Area Transit*, 975 F. Supp. 1 (D.D.C. 1997)—that suggests that *Penn Central* should be read broadly as applying to any government action, not just regulatory or legislative action. Br. of Appellant at 39-41.

In *Mekuria*, business owners in a Washington D.C. neighborhood brought an inverse condemnation suit against the local transit authority for the alleged taking of their property in constructing a rail station. According to the complaint, obstructions from the project cut off street access to the businesses and greatly hindered pedestrian access, resulting in loss of delivery services and customers. Two of the businesses closed and the others suffered revenue decreases of 70 to 90 percent. The construction caused physical damage to the properties including cracked walls, ceilings and floors, and flooding from sewer water flowing from the construction site. The construction also hindered police patrol, resulting in robberies and vandalism. *Mekuria*, 975 F. Supp. at 2-3. The plaintiffs alleged the transit authority's actions deprived them of reasonable access, denied them all viable economically beneficial or productive use of the properties, and thereby interfered with their investment-backed expectations. *Id.* at 3.

The transit authority argued that *Penn Central* did not apply because there was no regulatory or legislative governmental action. The court disagreed:

19

> The simple answer to this argument is that *Penn Central* can not be read so narrowly. For example, the Court explicitly refers to the possibility of compensable takings occurring as a result of a government's "public action" or "public program", neither of which necessarily require regulatory or legislative action. *See Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659. Similarly, *First English [Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 306-07, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987)] refers to "government action" which may constitute a taking. *See First English*, 482 U.S. at 314, 107 S. Ct. at 2385. Moreover, it makes no sense to limit *Penn Central* to apply merely to statutes and regulations, such as land use regulations, when there are myriad ways in which government action can seriously impact individual owners' use of their property.

*Id.* at 6.

The district court's analysis is flawed and unpersuasive. Both *Penn Central* and *First English* involved takings challenges to actual government regulations: *Penn Central* to a municipal law restricting development of historic landmarks, *see Penn Central*, 438 U.S. at 116, and *First English* to a flood protection ordinance, *First English*, 482 U.S. at 306-07. Between them, the cases speak of "public action," "public programs," or "government action," but each of those terms encompass regulation and actions taken pursuant to regulation, leaving no reason to believe that the Court was, in dicta, speaking of something other than regulation. Neither *Penn Central* nor *First English* discusses at all whether a *Penn Central* regulatory takings analysis applies to cases not involving a regulation, let alone holds that the analysis would apply in such a case.

*Mekuria* is a legal anomaly in its willingness to entertain a *Penn Central* regulatory taking claim where there was no regulation. The businesses harmed by the

transit authority's construction in *Mekuria* failed to plead a physical taking, which is what they had actually suffered. Because of that shortcoming in the pleading, the district court concluded that to find a taking, it had to find a regulatory taking. *Mekuria*, 975 F. Supp. at 5. Perhaps the court's analysis is problematic because it was results-oriented.

Following *Mekuria*, the United States Supreme Court has overruled the district court's approach, holding that a "longstanding distinction between acquisitions of property for public use . . . and regulations prohibiting private uses . . . makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002) (footnote omitted). The Supreme Court also observed that in determining whether government action affecting property is an unconstitutional deprivation of ownership rights, "a court must interpret the word 'taken[,]'" and identified only two senses in which property is "taken":

> When the government *condemns or physically appropriates* the property, the fact of a taking is typically obvious and undisputed. When, however, the owner contends a taking has occurred because *a law or regulation imposes restrictions* so severe that they are tantamount to a condemnation or appropriation, the predicate of a taking is not self-evident, and the analysis is more complex.

*Id.* at 322, n.17 (emphasis added).

Any number of businesses in the vicinity of the North-South Freeway project may have suffered reduced property value and lost income due to governmental acquisition and construction "actions" over the last 13 years that have not physically touched their property or legally restricted its use. It is well settled that such harm is not compensable in an inverse condemnation proceeding.[9] And just because a portion of Tapio's property is expected to be taken in the future does not make it different from its neighbors in this

---

[9] Other Washington decisions cited in Tapio's briefing as supporting recovery are not helpful because they either involve an actual invasion and impairment of use or access or were held not to be takings. *See Dickgieser v. State*, 153 Wn.2d at 533 (logging activities on adjacent land caused flooding that damaged private property); *Union Elevator & Warehouse Co. v. State*, 96 Wn. App. 288, 980 P.2d 799 (1999) (question of fact whether State's activities physically hindered access to plaintiff's adjacent property); *Rains v. Dep't of Fisheries*, 89 Wn.2d 740, 575 P.2d 1057 (1978) (State's denial of permit to rechannel creek bed that later overflowed and damaged plaintiff's property was not a taking); *Ackerman v. Port of Seattle*, 55 Wn.2d 400, 348 P.2d 664 (1960), *overruled on other grounds by Highline Sch. Dist.*, 87 Wn.2d 6 (1976) (noise interference caused by increased airplane overflights near airport); *Boitano v. Snohomish County*, 11 Wn.2d 664, 672-77, 120 P.2d 1490 (1941) (county's excavation activities resulted in water damage to plaintiff's neighboring property); *Tom v. State*, 164 Wn. App. 609, 614, 267 P.3d 361 (2011) (no taking attributable to noise from a neighboring prison firing range that pre-existed plaintiff's property ownership); *Pruitt v. Douglas County*, 116 Wn. App. 547, 559-60, 66 P.3d 1111 (2003) (inverse condemnation claim arose when county channeled water that flooded and destroyed market value of adjacent landowners' properties); *Highline Sch. Dist.*, 87 Wn.2d at 8, 15-16 (inverse condemnation claim arose when changes in airport operations led to marked increase in aircraft noise interference with adjacent land, including school classrooms, which would result in measurable diminution of property value, the extent of which presented a factual issue); *Lincoln Loan Co. v. State*, 274 Or. 49, 51, 545 P.2d 105, 107 (1976) (complaint alleged that the dismantling of dwellings in the surrounding properties created noise, dust and confusion) and *cf. Hall v. State*, 355 Or. 503, 516, 326 P.3d 1165 (2014) ("[N]othing in *Lincoln Loan* suggests that, in the absence of a physical occupation or invasion of a property right, a government action that causes only a reduction in the value of property qualifies as a taking.").

respect. *See Campbell v. United States*, 266 U.S. 368, 45 S. Ct. 115, 69 L. Ed. 328 (1924) (landowner was entitled to be compensated for a taking of 1.81 acres of his property but not for the diminution of the value of his remaining property attributable to government's acquisition of neighboring property and construction of large industrial plant); *Cent. Puget Sound Reg'l Transit Auth. v. Heirs & Devisees of Eastey*, 135 Wn. App. 446, 458, 144 P.3d 322 (2006) (damage to Eastey property caused by a pocket track on nearby land does not flow from the taking of a narrow strip of Eastey land, but from Transit's legal use of other land, and the damage to Eastey was no different than the damage (if any) to the rest of the neighborhood).[10]

This settled takings law also advances public interests, as recognized in a Texas decision cited by the Department:

> Construction of public-works projects would be severely impeded if the government could incur inverse-condemnation liability merely by announcing plans to condemn property in the future. Such a rule would encourage the government to maintain the secrecy of proposed projects as long as possible, hindering public debate and increasing waste and inefficiency. . . . After announcing a project, the government would be under pressure to acquire the needed property as quickly as possible to avoid or minimize liability. This likewise would limit public input, and

---

[10] It is well settled that when property is condemned for a project such as this, fair compensation for the property that is actually condemned and acquired by the State should disregard depreciation that is attributable to the project for which the eminent domain proceeding is instituted. *Lange v. State*, 86 Wn.2d 585, 591, 547 P.2d 282 (1976). That is the basis for the Department's repeated assurances to Tapio that when its property is ultimately condemned, it will be valued as if the freeway project had never occurred.

23

forestall any meaningful review of the project's environmental consequences. The government also would be reluctant to publicly suggest alternative locations, for fear that it might incur inverse condemnation liability to multiple landowners arising out of a single proposed project. . . .

. . . .

. . . The necessary review time between public announcement and acquisition of property for a particular project will depend on many factors unique to the project, including the projected cost, the number of feasible alternatives, the potential environmental impact, and the extent of federal involvement. . . . If the government were subject to liability for "unreasonable" delay . . . officials would be pressured to expedite property acquisition to avoid immediate liability to a particular landowner, regardless of the long-term social costs. Public policy dictates that the government be free to make this type of planning decision in the public interest, without threat of civil liability to a particular landowner.

*Westgate, Ltd. v. State*, 843 S.W.2d 448, 453-54 (Tex. 1992) (citations omitted); *see* Br. of Resp. at 34-35.

The Department's "actions" have not triggered application of *Penn Central* balancing.

### III. The trial court did not err in refusing to admit exhibit 35 or in denying Tapio's motion to reopen its case

Given the basis on which we affirm the trial court, its refusal to admit exhibit 35 initially, or by allowing Tapio to reopen its case, does not appear to matter. Because this was not addressed when Tapio abandoned its "taking by oppressive preacquisition conduct" claim at oral argument, however, we address the assignment of error.

Tapio offered exhibit 35 during Mr. Stejer's re-direct testimony. The exhibit contained one day's worth of an e-mail exchange among Department employees in

September and October of 2006. The subject matter was whether the Department, as landlord, should have reduced the rent of a commercial building on Market Street in order to have continued occupancy until project construction reached that area. Tapio contends that a passage in the e-mail demonstrates Department officials knew that acquiring and demolishing properties in a phase not funded for construction would leave the properties that were not acquired in a more blighted and depressed neighborhood.[11] It argues that such knowledge was relevant to its claims.

The Department objected and argued that the e-mail was not relevant because it described a different decision than it faced in deciding whether to acquire the Tapio Center: it involved a different property several miles north, was written five years before Tapio filed suit, and the one-day excerpt from the exchange was incomplete, out of context, and should not be admitted without proper foundation as to relevance.

The trial court sustained the objection, ruling it was not yet apparent that exhibit 35 proved anything and that Mr. Stejer was not the appropriate person to testify about its contents. The court said if the exhibit was to come in at all, it would have to be through

---

[11] The allegedly relevant passage states:

> We were figuring about 5 years before construction was slated for this area. So, in another 3 years we will have purchased more of the surrounding properties, creating an even more blighted or depressed commercial area along Market Street. We will also be 3 years closer to construction, which makes it an even riskier venture for any other potential tenant if [our lessee] is gone.

Ex. 35.

someone like Mr. Golden, who was a party to the e-mail exchange. When testimony resumed, Tapio's lawyer elicited Mr. Stejer's testimony that he had selected October 2006 as the taking date because the Department was "under the full knowledge that when they skip ahead and acquire property out of sequence from where they are actually doing construction . . . that their acquisition would create blight, and . . . that blight would reduce rents, increase vacancies, and ultimately affect the fair market value." RP at 914-15. It offered the exhibit again following that testimony, and the court again sustained the Department's objection. Tapio did not attempt to offer the exhibit through any other witness before resting its case.

A trial court's decision to exclude evidence will be reversed only where it has abused its discretion. *Kappleman v. Lutz*, 167 Wn.2d 1, 6, 217 P.3d 286 (2009). A trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons. *Id.*

On appeal, Tapio treats the trial court as sustaining an objection to a lack of authentication, which it contends was error because exhibit 35 had been authenticated through notice in accordance with ER 904. But authenticity was not at issue. The trial court declined to admit the exhibit because, as argued by the Department, Tapio did not

establish that Mr. Stejer had personal knowledge of the e-mail's contents sufficient to establish its relevance.

The proponent of evidence has the burden to establish necessary foundation for the evidence to be relevant and admissible. *See State v. Smith*, 87 Wn. App. 345, 348, 941 P.2d 725, 726 (1997). The general rule is "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that [he] has personal knowledge of the matter." ER 602.

The trial court did not abuse its discretion in denying admission through Mr. Stejer. He might or might not have been right about what amounted to his speculation that the e-mail reflected knowledge that applied to Tapio's situation. The court reasonably required Tapio to call a witness who could provide context, so that an informed decision could be made as to whether the e-mail exchange reflected knowledge that *was* relevant.

Tapio's final assignment of error is that the trial court erred by denying its motion to reopen, in order to call Mr. Golden and reoffer exhibit 35. Reopening a cause for additional evidence rests within the discretion of the court. *Tsubota v. Gunkel*, 58 Wn.2d 586, 591, 364 P.2d 549 (1961). The court denied the motion because Tapio had been told what the court would require as a reasonable basis for admitting the exhibit and did not

No. 33684-1-III
*Tapio Investment Company I. v. State*

re-call Mr. Golden for that purpose despite having the opportunity to do so. That is not

an abuse of discretion.

     Affirmed.

                                     Siddoway, J.

WE CONCUR:

Fearing, C.J.                    Lawrence-Berrey, J.

28