IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ROSIE L. TILLOTSON, | ) | No. 78939-2-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| UNIVERSITY OF WASHINGTON, | ) | UNPUBLISHED OPINION |
| Respondent. | ) | FILED: December 23, 2019 |

SMITH, J. — In 2016, Dr. Jeffrey Houlton, a physician at the University of Washington (UW), performed surgery on Rosie Tillotson to remove cancerous lymph nodes from her neck. Tillotson experienced complications following the surgery and later sued UW, alleging that Dr. Houlton was negligent and that UW was vicariously liable for Dr. Houlton's negligence. At trial, the jury heard testimony from Tillotson's sole expert, Dr. Barry Wenig. After Tillotson rested her case, UW moved for judgment as a matter of law, arguing that Dr. Wenig failed to identify any act or inaction by Dr. Houlton that fell below the standard of care. The trial court agreed and entered judgment in UW's favor.

We hold that because Dr. Wenig's testimony was sufficient for a reasonable jury to find that Dr. Houlton breached the standard of care by failing to stay "in bounds" when he performed surgery on Tillotson, the trial court erred by granting judgment as a matter of law. Therefore, we reverse and remand for further proceedings.

## BACKGROUND

Tillotson was diagnosed with papillary thyroid cancer following a biopsy of a lump that she first noticed on the back of her neck around Thanksgiving 2014. In January 2015, Tillotson underwent a thyroidectomy, performed by Dr. Ryan Stern, an otolaryngologist[1] at St. Francis Hospital. After the procedure, Tillotson was deemed "at relatively high risk of tumor recurrence."

In fall of 2015, Tillotson noticed a lump behind her left ear. Dr. Stern performed a biopsy, which came back positive for cancer. Dr. Stern then referred Tillotson to Dr. Houlton, a UW otolaryngologist, for surgery to remove lymph nodes from the left side of Tillotson's neck in a procedure known as a "neck dissection." Because Tillotson had previously undergone a thyroidectomy in this area, the procedure also constituted a "revision."

Dr. Houlton performed the revision and neck dissection on February 5, 2016. After surgery, Tillotson developed facial paralysis. An otolaryngology resident who examined Tillotson the morning after her surgery believed the paralysis was likely due to a "stretch injury" from which Tillotson would recover after several months. Dr. Houlton saw Tillotson later that day and discussed with her "that this is a very rare complication after a neck dissection." According to Dr. Houlton's notes from that visit, he considered it unlikely that Tillotson's symptoms were a result of a nerve injury but discussed the option of further surgical exploration to confirm.

---

[1] An otolaryngologist is "a specialist in otolaryngology," which is "a branch of medicine that deals with the ear, nose, and throat and their disorders and diseases." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1599 (2002).

According to a later medical record, Dr. Houlton's recommendation for surgical exploration became "more direct" after there "was no recovery of [Tillotson's] facial nerve on subsequent exams and after further discussions." Thus, on February 8, 2016, Dr. Houlton, assisted by Dr. Amit Bhrany, a facial nerve expert, performed a surgical examination of Tillotson. According to the record from that procedure, the examination revealed that the main trunk of Tillotson's facial nerve had been transected.

Dr. Houlton and Dr. Bhrany conducted a procedure to repair the nerve, and Tillotson was discharged a few days later. Tillotson continued to experience symptoms, including dryness in her left eye and drooping in her face. In May 2017, Tillotson sued UW, alleging that it was vicariously liable for negligent medical care provided by Dr. Houlton.[2]

A jury trial began on August 13, 2018. On August 15, the jury heard testimony from Tillotson's only expert, Dr. Barry Wenig. Dr. Wenig is an otolaryngologist and a head and neck surgeon who, according to his testimony, has performed "[a]nywhere between about 1,600 to about 2,000" neck dissections, about two-thirds of which were lateral neck dissections like the one at issue in this case. He operates on about 25 to 30 thyroid tumors on average in a year, and of those, at least half are papillary thyroid cancer. He estimated that he has conducted "probably around 10" revision surgeries for the removal of

---

[2] Tillotson's complaint also named the UW Medical Center and the State of Washington, and it included a claim for failure to obtain informed consent. The UW Medical Center and the State were later dismissed, as was Tillotson's informed consent claim. Those dismissals are not at issue in this appeal.

papillary thyroid carcinoma like the procedure performed by Dr. Houlton.

Since completing a fellowship in 1985 at the Memorial Sloan Kettering Cancer Center in New York, Dr. Wenig has been in academic practice, meaning that he has "always worked for a university or a college of medicine regardless of where [he] was." He is currently employed by the University of Illinois in Chicago, where his title is chairman of the Department of Otolaryngology-Head and Neck Surgery. Dr. Wenig is board certified and is actively licensed to practice medicine in Illinois, New York, and Michigan. He has served as an expert witness "for quite some time." Initially he was more commonly asked by plaintiffs' attorneys to review cases, but currently, "about half the requests that [he] get[s] are for plaintiffs and about half are for defense." He has testified in trial a few times before, including in Washington in November 2015, when he testified for the defense on behalf of the attorney representing UW in this case.

Before asking Dr. Wenig to state his conclusions about Dr. Houlton's treatment, Tillotson's counsel asked Dr. Wenig to make an assumption regarding the applicable standard of care:

> Q. I want to talk about your conclusions now, but before I do that, I want you to assume that in the state of Washington -- and I understand you've testified here in the recent past -- a head and neck surgeon like Dr. Houlton had the duty to exercise the degree of skill, care, and learning expected of a reasonably prudent physician in the state of Washington acting in the same or similar circumstances as the care and treatment at issue here. With that understanding, Dr. Wenig, do you have an opinion as to whether Dr. Houlton met or fell below the standard of care in this case?
>
> A. Yes, I do.

Dr. Wenig then testified that in his opinion, Dr. Houlton fell below the standard of

4

care for two reasons and that Dr. Houlton's failures caused harm to Tillotson:

> Q. And what is [your] opinion?
>
> A. That Dr. Houlton fell below the standard of care in this particular matter.
>
> Q. Generally speaking, why is that?
>
> A. I think that there are two reasons. Number one is I think that he was operating out of bounds of what would normally be a lateral neck dissection for metastatic recurrent papillary thyroid cancer. And the second reason, I believe, is that he transected the facial nerve because he was removing tissue that he couldn't identify.
>
> Q. And, Dr. Wenig, have you also come to a conclusion about whether or not these failures caused Ms. Tillotson harm?
>
> A. Yes.
>
> Q. And before I do that, I want you to assume that all of your conclusions must be held to a reasonable degree of medical probability. So we aren't dealing with possibilities. Your conclusions must be more probably true than not true. Do you understand that?
>
> A. Yes, I do.
>
> Q. And with that understanding, did these failures cause Ms. Tillotson harm?
>
> A. Yes.
>
> Q. What harm was that?
>
> A. Her facial nerve was transected, resulting in paralysis of the face.

Dr. Wenig then elaborated on his conclusion that Dr. Houlton had operated "out of bounds." Specifically, he explained that lymph nodes are present in six recognized "levels" in the neck. He testified that level 1 is "right under the jawbone and the chin." Levels 2, 3, and 4 are the "jugular nodes," level

5

5 is "the area in the back of the neck . . . behind the big muscle in the neck, otherwise known as the sternocleidomastoid muscle," and level 6 consists of "the lymph nodes in and around the central portion of the neck, . . . in and around the thyroid gland and trachea itself." Dr. Wenig also explained that a surgeon uses anatomical landmarks to know where he or she is during a neck dissection procedure: "Well, by and large, neck structures are constant. So when someone operates on their neck, you would try and find these constant structures that help you identify where you are and potentially keep you out of trouble." He explained that one of those anatomical landmarks is the digastric muscle, which "begins under the chin, and . . . extends backwards, up towards what we call the mastoid tip, which is the bony protrusion behind the ear and below the ear." Dr. Wenig explained that the digastric muscle serves as the upper boundary of a lateral neck dissection and that it sits between the facial nerve and the highest lymph node in the chain that Dr. Houlton was planning to dissect. To that end, Dr. Wenig explained that when he teaches his students about a selective neck dissection of lymph nodes like the one performed by Dr. Houlton, he does not include a conversation about the main trunk of the facial nerve "[b]ecause it's not in the field of the surgery, the anticipated surgery. So one wouldn't necessarily discuss it, because you're not considering it to be part of the surgery or at risk during the surgery." Nevertheless, and although Dr. Wenig did not know how or when it happened, the facial nerve was transected during Tillotson's surgery.

Dr. Wenig also discussed a pathology report for the surgery that Dr. Houlton performed. He explained that the pathology report helped to understand

where Dr. Houlton was working during the surgery because it refers to "'[d]esignated tissue adjacent to mastoid excision.'" He explained that the mastoid, which is the bony structure from which the facial nerve exits, is "above and out of the field of what would be considered a lateral neck dissection" but that the pathology report indicated that tissue was removed from that area.

Finally, Dr. Wenig testified that although one particular branch of the facial nerve may come into play in a neck dissection like the one Dr. Houlton performed, transecting the main trunk of the facial nerve is not a known complication of that kind of neck dissection surgery. Additionally, while acknowledging that Dr. Houlton encountered scar tissue during Tillotson's procedure, Dr. Wenig testified that he had never heard of scar tissue causing the main trunk of the facial nerve to be anatomically out of place.

On cross-examination, Dr. Wenig gave the following testimony:

Q. Now, Doctor, you offered some standard of care opinions in this case, and I want to follow up on those. Your opinion in this case is really that the injury itself indicates that Dr. Houlton violated the standard of care, correct?

A. Yes.

Q. You can't say what specific action or inaction by Dr. Houlton violated the standard of care, right?

A. Yes.

Q. So, in fact, rather than relying on a specific action or inaction, it's your opinion only that the injury itself indicates that he violated the standard of care, true?

A. True.

Q. And you don't believe there are any other standard of care violations other than what you just said, right?

7

A. True.

Q. And it's true that you can't articulate what was done in this case that was below the standard of care other than the fact that you think it was a violation because there was an injury; isn't that right?

A. Yeah, there was an injury when a nerve that was not part of the surgery was injured.

On redirect, Dr. Wenig was asked why, apart from the fact that it occurred, the transection that cut the facial nerve supported his opinion that Dr. Houlton fell below the standard of care. He responded:

Because in the course of a lateral neck dissection, the facial nerve does not come into play. So the fact that the nerve is cut means that you're in an area that you should not need to be in for the operation that was planned. So, basically, you're out of the boundaries of what you would expect to be a lateral neck dissection.

Dr. Wenig also testified that in addition to being too far superior to (i.e., farther from the feet than) the levels in which he planned to operate, "[b]y cutting the facial nerve, [Dr. Houlton] was at a deeper plane than he needed to be at."

After Dr. Wenig testified, the jury heard testimony from a number of lay witnesses, including Tillotson and her husband. After Tillotson rested her case, UW moved for judgment as a matter of law. It argued that the court should grant its motion for two reasons: First, because Dr. Wenig "provided no testimony establishing that he was sufficiently familiar with the standard of care for otolaryngologists practicing in the state of Washington or that such standard is a national standard," and second, because Dr. Wenig "could not identify any act or inaction by Dr. Houlton that fell below the standard of care or explain what the

8

standard of care required Dr. Houlton to do that he did not do."

The trial court concluded that Dr. Wenig's testimony was sufficient for a jury to find that he was familiar with the standard of care in Washington. But it agreed with UW that Dr. Wenig "did not testify what a reasonable doctor would or would not have done" and thus granted UW's motion for judgment as a matter of law. Tillotson appeals.[3]

## DISCUSSION

Tillotson argues that the trial court erred by granting UW's motion for judgment as a matter of law. We agree.

*Standard of Review and Legal Standard*

This court reviews de novo a trial court's decision on a motion for judgment as a matter of law. H.B.H. v. State, 197 Wn. App. 77, 85, 387 P.3d 1093 (2016), aff'd, 192 Wn.2d 154, 429 P.3d 484 (2018). To this end, and as an initial matter, the parties disagree as to whether the standard for judgment as a matter of law differs from the standard for summary judgment. Tillotson points out that CR 56, governing summary judgment, requires the nonmoving party to set forth "specific facts" to defeat summary judgment. See CR 56(e). Tillotson

---

[3] Before Tillotson appealed, she moved for reconsideration, which the trial court denied. Although Tillotson's notice of appeal designated both the trial court's judgment and its order denying reconsideration, Tillotson did not assign error to the trial court's denial of reconsideration and did not provide argument or citations to authority with regard to that denial. Therefore, we consider only the trial court's entry of judgment as a matter of law. RAP 10.3(a)(4), (6); see also Escude ex rel. Escude v. King County Pub. Hosp. Dist. No. 2, 117 Wn. App. 183, 190 n.4, 69 P.3d 895 (2003) ("It is well settled that a party's failure to assign error to or provide argument and citation to authority in support of an assignment of error, as required under RAP 10.3, precludes appellate consideration of an alleged error.").

contends that because CR 50, governing judgment as a matter of law, contains no "specific facts" requirement, the standard for judgment as a matter of law is more favorable to the nonmoving party than the standard for summary judgment. Meanwhile, UW contends that "Washington courts consistently equate the two" standards.

We disagree with both contentions. On the one hand, UW's suggestion that the two standards are equivalent is incorrect. CR 50 and CR 56 address two distinct circumstances and, by their express terms, set forth two distinct standards. Specifically, under CR 50, judgment as a matter of law is appropriate on any claim that is dependent on an issue with respect to which the nonmoving party has been *fully heard during a jury trial* if there is *"no legally sufficient evidentiary basis for a reasonable jury to find . . . for [the nonmoving party] with respect to that issue."* (Emphasis added.) In other words, under CR 50, the trial court weighs the evidence to determine whether a reasonable jury could find in favor of the nonmoving party. In doing so, the trial court necessarily must consider all evidence *as presented to the jury*, including not only each witness's *direct* testimony but also any damaging *cross-examination* testimony.

By contrast, under CR 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, *show that there is no genuine issue as to any material fact* and that the moving party is entitled to judgment as a matter of law." (Emphasis added.) Put another way, under CR 56, the court asks only whether the nonmoving party has established that there are issues of material fact that

the jury must decide. And because summary judgment arises before the nonmoving party's evidence is presented to a jury and tested by cross-examination, the court necessarily cannot make the same inquiry as it does under CR 50, i.e., whether the evidence *as presented to the jury* is sufficient to support a finding in favor of the nonmoving party. Therefore, and although cases applying CR 56 may be instructive in the CR 50 context, we disagree with UW's suggestion that the two standards are equivalent.

On the other hand, Tillotson makes too much of CR 56's reference to "specific facts" in arguing that CR 56 is less favorable to the nonmoving party than CR 50. The reference to "specific facts" is found in CR 56(e), which simply explains that the nonmoving party cannot defeat summary judgment by relying on conclusory allegations and denials, such as those in a pleading, but "must set forth specific facts showing that there is a genuine issue for trial." The absence of the words "specific facts" from CR 50 says nothing about any equivalency, or lack thereof, between CR 50 and CR 56.

In short, CR 56 and CR 50 set forth different standards because they address two distinct circumstances. Here, our review is of an order granting judgment as a matter of law. Therefore, we apply the standard set forth in CR 50.

Under CR 50, "[i]f . . . a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find . . . for that party with respect to that issue," then the court may grant judgment as a matter of law against that party "on any claim . . . that cannot under the

controlling law be maintained without a favorable finding on that issue."
CR 50(a)(1).

"A motion for judgment as a matter of law admits the truth of the opponent's evidence and all reasonable inferences that can be drawn from it." Tapio Inv. Co. I v. State, 196 Wn. App. 528, 538, 384 P.3d 600 (2016), review denied, 187 Wn.2d 1024 (2017). "'Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'" Tapio Inv. Co., 196 Wn. App. at 538 (quoting Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816 (1997)). "'Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'" Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001) (quoting Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980)). As further discussed below, Dr. Wenig's testimony, when viewed in the light most favorable to Tillotson, was sufficient to sustain a verdict in Tillotson's favor. Therefore, the trial court erred by granting judgment as a matter of law.

*Analysis*

To establish a claim of medical negligence based on failure to follow the accepted standard of care, a plaintiff must establish the following elements:

> (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances; [and]
> (2) Such failure was a proximate cause of the injury

12

complained of.

RCW 7.70.040. "The applicable standard of care and proximate causation generally must be established by expert testimony." Grove v. PeaceHealth St. Joseph Hosp., 182 Wn.2d 136, 144, 341 P.3d 261 (2014). "[T]his requires 'an expert to say what a reasonable doctor would or would not have done, that the [defendants] failed to act in that manner, and that this failure caused [the] injuries.'" Reyes v. Yakima Health Dist., 191 Wn.2d 79, 86, 419 P.3d 819 (2018) (second and third alterations in original) (quoting Keck v. Collins, 184 Wn.2d 358, 371, 357 P.3d 1080 (2015)). "The expert may not merely allege that the defendants were negligent and must instead establish the applicable standard and how the defendant acted negligently by breaching that standard." Reyes, 191 Wn.2d at 86-87. "Furthermore, the expert must link his or her conclusions to a factual basis." Reyes, 191 Wn.2d at 87.

Here, for the following reasons, Dr. Wenig's testimony and the reasonable inferences therefrom were sufficient to sustain a verdict in Tillotson's favor on her medical negligence claim.

First, Dr. Wenig's testimony established what a reasonable doctor would or would not have done. Specifically, Dr. Wenig explained which anatomical landmarks marked the boundaries of the neck dissection procedure that Dr. Houlton performed. He also explained that surgeons use these anatomical landmarks to help "identify where you are and potentially keep you out of trouble." A reasonable inference from this testimony is that the applicable standard of care requires the surgeon to identify the boundaries for the neck

dissection procedure based on specific anatomical landmarks and not venture outside of those boundaries.

Second, Dr. Wenig testified as to how Dr. Houlton acted negligently by breaching the standard of care. Specifically, Dr. Wenig testified that Dr. Houlton breached the standard of care by operating "out of bounds," i.e., outside of the boundaries demarcated by the relevant anatomical landmarks—and, specifically, the digastric muscle.

Third, Dr. Wenig's conclusion was linked to a factual basis. Specifically, Dr. Wenig's testimony was supported by medical records reflecting that Dr. Houlton discovered, upon surgical exploration, that the main trunk of Tillotson's facial nerve had been transected. In other words, Dr. Wenig's conclusion—far from being speculative as UW contends—was linked to the fact, established by UW's own medical records, that Tillotson's facial nerve was transected. It was also supported by the pathology report indicating that Dr. Houlton had removed tissue from an area "out of the field of what would be considered a lateral neck dissection."

Finally, Dr. Wenig testified, as required under RCW 7.70.040, that Dr. Houlton's negligent transection of Tillotson's facial nerve was the proximate cause of Tillotson's injuries, i.e., paralysis of the face.

In sum, Dr. Wenig's testimony provided facts that, if believed, would allow a reasonable jury to find in favor of Tillotson regarding each element of proof required by RCW 7.70.040. Therefore, the trial court erred by entering judgment as a matter of law. Schmidt v. Coogan, 162 Wn.2d 488, 493, 173 P.3d 273

(2007) ("Where the evidence produced by the nonmoving party produces facts that would allow a reasonable person to find for that party, judgment as a matter of law is inappropriate."); cf. Keck, 184 Wn.2d at 371-72 (holding, in summary judgment context, that expert's declaration stating that defendant surgeons "'performed multiple operations without really addressing the problem of non-union and infection within the standard of care'" was sufficient to establish genuine issue of material fact).

UW relies primarily on Reyes, the case on which the trial court also relied, to argue that judgment as a matter of law was proper here. But Reyes is readily distinguishable from this case. There, Judith Reyes sued Yakima Health District (YHD) after her husband died following treatment at YHD. Reyes, 191 Wn.2d at 83. She alleged that YHD was negligent because it failed to diagnose her husband's liver disease and instead treated him for tuberculosis. Reyes, 191 Wn.2d at 88. In support of her claims, Reyes obtained an affidavit from Dr. Rosa Martinez, who stated that Reyes' husband "'presented to [YHD] . . . with clinical symptoms of liver failure that should have been easily diagnosed by observation of the patient.'" Reyes, 191 Wn.2d at 88.

In upholding the trial court's summary dismissal of Reyes' claims, our Supreme Court described the case as a "close call" but held that Dr. Martinez's affidavit failed to establish a genuine issue of material fact. Reyes, 191 Wn.2d at 86. It explained that although "misdiagnosis may subject a physician to a negligence action 'where such misdiagnosis breaches the standard of care,'" Dr. Martinez's affidavit contained "no indication of what a reasonable physician

should have done other than diagnose liver failure by observation of the patient." Reyes, 191 Wn.2d at 88-89 (quoting Backlund v. Univ. of Wash., 137 Wn.2d 651, 661, 975 P.2d 950 (1999)). But here, as discussed, Dr. Wenig's testimony, when viewed in the light most favorable to Tillotson, *does* indicate what a reasonable physician should have done. Specifically, Dr. Wenig's testimony indicates that a reasonable physician would have identified the relevant anatomical landmarks and would have stayed within those landmarks. Thus, Reyes is not persuasive here.

UW next argues that Dr. Wenig's testimony was "entirely circular" and amounts to "a conclusory assertion that Dr. Houlton breached the standard of care based on nothing more than the fact of injury itself." UW is correct that a medical negligence claim generally cannot be premised solely on the fact of the injury itself. See Watson v. Hockett, 107 Wn.2d 158, 161, 727 P.2d 669 (1986) ("[A] doctor will not normally be held liable . . . simply because the patient suffered a bad result."). Rather, the plaintiff must produce expert testimony "showing what the applicable standard of care was and how the defendant violated it." Reyes, 191 Wn.2d at 89. But Dr. Wenig did not premise his opinion solely on the fact that Tillotson experienced facial paralysis following her neck dissection. Rather, Dr. Wenig explained what the applicable standard of care was, i.e., that it required Dr. Houlton to identify the boundaries for the procedure and to stay within them. Dr. Wenig further opined that Dr. Houlton violated this standard by operating out of bounds. Therefore, Dr. Wenig's testimony was not circular as UW contends.

16

To this end, UW also points out that during Dr. Wenig's cross-examination, he agreed with UW's counsel that "*the injury itself* indicates that Dr. Houlton violated the standard of care" and he could not "say what specific action or inaction by Dr. Houlton violated the standard of care." (Emphasis added.) But this testimony cannot be viewed in a vacuum. On redirect, when Dr. Wenig was able to elaborate, he explained that "the fact that the nerve is cut *means that you're in an area that you should not need to be in* . . . you're out of the boundaries of what you would expect to be a lateral neck dissection." (Emphasis added.) Dr. Wenig also had testified on direct that the nerve transection "result[ed] in paralysis of the face." In short, and despite UW's success in getting Dr. Wenig to concede on cross-examination that he was equating injury with breach, his testimony, taken as a whole, did not. Rather, when Dr. Wenig's testimony is viewed as a whole and in the light most favorable to Tillotson, a reasonable juror could have concluded that the injury at issue was not the transection itself, but rather facial paralysis, which in turn was caused by Dr. Houlton's operating out of bounds, *as evidenced by* the fact that Tillotson's facial nerve was transected. Therefore, UW's reliance on Dr. Wenig's cross-examination testimony is misplaced.

UW next points out that Dr. Wenig also conceded on cross-examination that Dr. Houlton reasonably believed that he was not out of bounds. Specifically, Dr. Wenig testified as follows on cross-examination:

> Q. And we talked about this a little bit before, but you understand from reading Dr. Houlton's deposition that he used the landmarks of the sternocleidomastoid, the mastoid tip and the digastric muscle when he performed this procedure, true?

17

A. Yes.

Q. And those were reasonable landmarks to use during this procedure, right?

A. Yes.

Q. And you agree that in the lateral neck dissection and revision, the use of the digastric muscle as a landmark typically prevents injury of the facial nerve during surgery, true?

A. Typically, yes.

Q. All right. And you understood from Dr. Houlton's testimony that he believed he was staying on the plane of the digastric muscle as he was dissecting, correct?

A. That's what he said, yes.

Q. And if he did that, you would agree that that would be reasonable for him to do, right?

A. If he did that, yes.

Q. And you would agree that during this surgery, there was no reason for Dr. Houlton to think that he had transected the facial nerve, correct?

A. Correct.

Q. *And would you agree that Dr. Houlton believed he was on a different plane than the plane that the facial nerve ran through during the dissection process, correct?*

A. *Yes.*

Q. *And it was reasonable for him to believe that he was on a different plane during the dissection, correct?*

A. *Yes.*

(Emphasis added.)

UW argues that this testimony amounted to an "affirm[ance]" that Dr.

Houlton believed he was on a different plane than that of the facial nerve . . . and that there was no reason for him to believe that he had transected the facial nerve." But as discussed, Dr. Wenig's cross-examination cannot be viewed in a vacuum. Also as discussed, Dr. Wenig's testimony was sufficient for a jury to find that Dr. Houlton breached the standard of care merely by operating out of bounds. If the jury made such a finding, whether or not Dr. Houlton *reasonably believed* he was in bounds would be irrelevant. Therefore, UW's reliance on Dr. Wenig's cross-examination is again misplaced.

UW also observes that this case is not a res ipsa loquitur case.[4] It points out that although Tillotson indicated in her complaint that she intended to rely on res ipsa loquitur, she later acceded to UW's motion in limine requesting that the court decline to give a res ipsa loquitur jury instruction. But the fact that this case is not a res ipsa loquitur case is inapposite because a jury may, even in the absence of a res ipsa loquitur instruction, consider circumstantial evidence in determining negligence and causation. See Ripley v. Lanzer, 152 Wn. App. 296, 307, 215 P.3d 1020 (2009) ("'Negligence and causation, like other facts, may of course be proved by circumstantial evidence.'" "'A res ipsa loquitur case is

---

[4] "[R]es ipsa loquitur is a rule of evidence that allows an inference of negligence from circumstantial evidence to prove a defendant's breach of duty where (1) the plaintiff is not in a position to explain the mechanism of injury, and (2) the defendant has control over the instrumentality and is in a superior position to control and to explain the cause of the injury." Robison v. Cascade Hardwoods, Inc., 117 Wn. App. 552, 563, 72 P.3d 244 (2003). "The practical effect of the doctrine of res ipsa loquitur is to rely on circumstantial evidence to permit a presumption or inference of negligence and place upon the defendant the burden of coming forward with evidence rebutting or overcoming the presumption." A.C. ex rel. Cooper v. Bellingham Sch. Dist., 125 Wn. App. 511, 516-17, 105 P.3d 400 (2004).

ordinarily *merely one kind of case of circumstantial evidence*, in which the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it.'" (emphasis added) (footnote omitted) (quoting Metro. Mortg. & Sec. Co. v. Wash. Water Power, 37 Wn. App. 241, 243, 679 P.2d 943 (1984))). And here, the pathology report and the fact that Tillotson's facial nerve was transected were circumstantial evidence of Dr. Houlton's breach under Dr. Wenig's characterization of the standard of care. Therefore, the fact that this case is not a res ipsa loquitur case does not support UW's arguments in favor of affirming judgment as a matter of law.

UW next renews its argument that Dr. Wenig failed to establish that he was familiar with the standard of care in Washington or that the standard is a national one. Thus, UW argues, "Tillotson had no expert testimony establishing the standard of care of a physician 'in the state of Washington, acting in the same or similar circumstances' as was Dr. Houlton in performing a revision neck dissection." UW contends that this amounts to a "failure to provide the jury with definitive expert testimony concerning the standard of care" and that this failure "invited the jury to speculate." It contends further that this alleged failure serves as an alternate basis for affirming the trial court's entry of judgment as a matter of law. See Pasado's Safe Haven v. State, 162 Wn. App. 746, 760, 259 P.3d 280 (2011) ("[W]e may properly affirm a trial court judgment on any basis established by the pleadings and supported by the record.").

But Dr. Wenig's testimony *was* sufficient for a reasonable juror to make a nonspeculative finding as to the standard of care required of a physician in

Washington. Specifically, Tillotson's counsel asked Dr. Wenig to assume that Dr. Houlton "had the duty to exercise the degree of skill, care, and learning expected of a reasonably prudent physician *in the state of Washington* acting in the same or similar circumstances" as Dr. Houlton. (Emphasis added.) He then asked Dr. Wenig, "*With that understanding*, . . . do you have an opinion as to whether Dr. Houlton met or fell below the standard of care in this case?" (Emphasis added.) Dr. Wenig responded, "Yes, I do." He then opined that Dr. Houlton fell below the standard of care for two reasons:

> Number one is I think that he was operating out of bounds of what would normally be a lateral neck dissection for metastatic recurrent papillary thyroid cancer. And the second reason, I believe, is that he transected the facial nerve because he was removing tissue that he couldn't identify.

When viewed in the light most favorable to Tillotson, this testimony, together with Dr. Wenig's earlier testimony that he testified as an expert in Washington in 2015, was sufficient to support a finding that Dr. Wenig was familiar with the Washington standard of care.[5] Otherwise, Dr. Wenig would not have answered yes when asked if, *with the understanding* that Dr. Houlton "had the duty to exercise the degree of skill . . . expected of a reasonably prudent physician *in the state of Washington* acting in the same or similar circumstances," he had an opinion as to whether Dr. Houlton met the standard. (Emphasis added.) Dr. Wenig's testimony was also sufficient, when viewed in the light most favorable to Tillotson, to support a finding that the aforementioned

---

[5] For this reason, we do not address Tillotson's argument that Dr. Wenig was not required to testify as to a Washington-specific standard of care.

standard of care required Dr. Houlton not to operate "out of bounds" or remove tissue he could not identify.

UW primarily relies on Boyer v. Morimoto, ___ Wn. App. 2d ___, 449 P.3d 285 (2019), Driggs v. Howlett, 193 Wn. App. 875, 371 P.3d 61 (2016), and Winkler v. Giddings, 146 Wn. App. 387, 190 P.3d 117 (2008), to support its argument that Dr. Wenig's testimony was insufficient to establish his familiarity with the standard of care. But in each of those medical negligence cases, the defendant doctor challenged the plaintiff's expert's testimony on *admissibility* grounds, *before* the expert testified. See Boyer, 449 P.3d at 289 (defendant challenged expert's qualifications at summary judgment); Driggs, 193 Wn. App. 887 (defendant moved in limine to preclude plaintiff's expert's testimony as lacking proper foundation); Winkler, 146 Wn. App. at 392 (trial court excluded plaintiff's expert's testimony after making a preliminary finding that the expert was not familiar with the Washington standard of care). Here, by contrast, UW's argument is not that Dr. Wenig's testimony was inadmissible, but rather that it was insufficient to support a finding as to what the standard of care required of Dr. Houlton.[6] Therefore, UW's reliance on Boyer, Driggs, and Winkler is

---

[6] At oral argument, UW argued that "it is a particularly necessary function that you establish what [the] standard is, *and if the expert has no familiarity with that*, then you've failed to establish an element of the case." (Emphasis added.) In other words, UW suggested at oral argument that its challenge to Dr. Wenig's testimony goes not just to its sufficiency, but also to its admissibility—specifically, whether Dr. Wenig was qualified to testify as to the standard of care in Washington. See ER 702 (expert witness must be qualified); see also ER 104(a) (Witness qualification is a preliminary question to be determined by the trial court.). But UW did not challenge Dr. Wenig's qualifications below. Indeed, in its reply in support of its motions in limine, UW stated that it "does not challenge the admissibility of Dr. Wenig's testimony on the basis that he is not qualified under

misplaced.

We reverse and remand for further proceedings.

WE CONCUR:

---

ER 702." UW also did not make a timely objection to Dr. Wenig's testimony on foundational grounds so as to allow the trial court to create a record on the issue of whether Dr. Wenig was qualified. Therefore, UW waived any challenge to the admissibility of Dr. Wenig's testimony. See ER 103 (providing that all objections must be timely and specific); see also State v. Stoddard, 192 Wn. App. 222, 227, 366 P.3d 474 (2016) (observing that timely objections serve to address several concerns, including "facilitat[ing] appellate review by ensuring that a complete record of the issues will be available, and prevent[ing] adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he or she had no opportunity to address").